529 A.2d 1085

**COMMONWEALTH of Pennsylvania**

**v.**

**Richard LEMANSKI, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 3, 1986.

Filed July 20, 1987.

334

Paul D. Boas, Pittsburgh, for appellant.

Martha J. Duvall, Assistant District Attorney, Coudersport, for Com., appellee.

Before CIRILLO, President Judge, and BROSKY and POPOVICH, JJ.

CIRILLO, President Judge:

Appellant, Richard Lemanski, appeals from a judgment of sentence entered in the Court of Common Pleas of Potter County, following his conviction of possession of a controlled substance and manufacture of marijuana. We reverse and remand.

In October of 1984, Trooper Dale Cogley of the Pennsylvania State Police received a tip from an informant that plants, suspected of being marijuana, were growing in appellant's greenhouse. The informant was a private citizen and, according to Trooper Cogley's affidavit, was "familiar" with marijuana identification. Based on this information, Trooper Cogley drove past the Lemanski residence. From the road he saw a greenhouse, or sun room, connected to Lemanski's home. He also saw plants growing through the greenhouse roof, but, due to the distance, he was unable to identify them. Thereafter, Trooper Cogley and Officer Weidner of the local police department went to the road adjacent to the Lemanski home. With the aid of binoculars and a zoom lens, they identified the plants as marijuana.

Later, Trooper Cogley and Officer Weidner spoke with another citizen informant, who gave them essentially the same information as the first informant. Trooper Cogley and Officer Weidner went back to the Lemanski home to investigate, whereupon they saw two marijuana plants in the greenhouse at close range.

After obtaining a search warrant, the police returned. Mrs. Lemanski answered the door and consented to a search of her home. Approximately one and one-half pounds of marijuana were seized, and both Mr. and Mrs. Lemanski were arrested.[1]

Appellant filed a motion to suppress the marijuana, alleging that the visual intrusion and physical trespass by Cogley and Weidner constituted an illegal search and, thus, the marijuana seized was inadmissible as "fruit of the poisonous tree." This motion was denied.

1. Mrs. Lemanski was tried and found not guilty.

Appellant also filed two motions to disqualify the trial judge, the Honorable Harold B. Fink. The first of these motions was based on an alleged personal bias against marijuana litigants. Specifically, the appellant alleged that Judge Fink had a history of improper sentencing practices in drug cases. The second recusal motion was based upon appellant's allegation that Judge Fink had heard prejudicial information that would be inadmissible at trial (guilty plea and withdrawal of guilty plea). Both of these motions were denied.

With respect to the first recusal motion, appellant also filed a motion for appointment of another judge to hear that motion. This was also denied.

At trial, appellant testified on his own behalf, stating that he grew the marijuana solely for his personal use. He testified that he grew marijuana because he did not want to associate with the type of people who sold drugs. The trial court prohibited appellant's character witnesses from testifying as to appellant's reputation for honesty. In addition, appellant was prevented from cross-examining the co-defendant, Mrs. Lemanski, who was represented by her own counsel at trial.

A jury convicted appellant of possession of a controlled substance and manufacture of marijuana. Post-trial motions were denied, and appellant raises the following issues for our review:

I Whether the trial court erred in not granting recusal based upon appellant's claim of a personal bias against persons charged with drug offenses?

II Whether the trial court erred in not granting recusal after its rejection of a plea agreement, the withdrawal of a guilty plea, and the hearing of highly prejudicial information that would not be admissible at trial?

III Whether the trial court erred in denying appellant's motion to suppress evidence in that the pre-warrant visual and physical intrusions by police of appellant's residence constituted a search and seizure without probable cause?

IV Whether appellant should have been permitted to introduce character witnesses as to his reputation for honesty in that he placed his credibility at issue by testifying on his own behalf?

V Whether the trial court erred in denying appellant the right to question the co-defendant?

VI Whether the trial court erred in advising the jury that they need not accept the stipulation regarding the marijuana being for personal use, and whether the court erred in not granting a mistrial after the Commonwealth told the jury in its closing that they need not accept the same stipulation and suggested they reject it?

VII Whether any further proceedings in this matter should be remanded to a different judge because of appellant's involvement in proceedings against Judge Fink before the Judicial Inquiry and Review Board?

Because we remand for a new trial, where these questions are likely to reappear, we address each issue.

I

Recusal is required whenever there is a substantial doubt as to a jurist's ability to preside impartially. The Code of Judicial Conduct calls for disqualification where a judge's impartiality "might reasonably be questioned, including but not limited to instances where ... he has a personal bias or prejudice concerning a party...." Code of Judicial Conduct, Canon 3, subd. C(1)(a).

Appellant argues that the trial court erred in not granting recusal[2] because Judge Fink had a personal bias against defendants in marijuana cases. Appellant has cited a num-

2. As noted above, appellant requested that another judge be appointed to hear this motion. Although this request was not granted, the issue is no longer in dispute. The Commonwealth concedes that it was error for the court to decide the recusal motion under the facts of this case. *See Municipal Publications v. Court of Common Pleas,* 507 Pa. 194, 489 A.2d 1286 (1985) (where the trial judge brings his credibility into issue by having to admit or deny certain facts, he is not in the position to maintain an objective posture over the proceedings and should disqualify himself).

ber of drug offense cases from the Court of Common Pleas of Potter County, in which sentences imposed by Judge Fink were vacated by the Superior Court due to failure to properly apply the Sentencing Guidelines and reliance on improper factors.[3] In addition, appellant refers us to comments made from the bench and in a local newspaper interview where Judge Fink candidly expressed both his displeasure with the Sentencing Guidelines and his opinion that in all drug cases the maximum penalty should be imposed.

The party who asserts that a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice or unfairness necessitating recusal. *Commonwealth v. Darush,* 501 Pa. 15, 23, 459 A.2d 727, 732 (1983). Further, the decision by a judge against whom a plea of prejudice is made will not be disturbed absent an abuse of discretion. *Id.* A party is not limited to his own case in establishing personal bias, and may show "temperamental prejudice on the particular class of litigation involved" to support his allegations. *Commonwealth v. Kane,* 199 Pa.Super. 89, 91, 184 A.2d 405, 406–07 (1962).

Our Supreme Court has held that when a judge "believes his impartiality can be reasonably questioned," he should recuse himself, just as he should if he himself has doubt as to his ability to preside impartially. *Commonwealth v. Goodman,* 454 Pa. 358, 361, 311 A.2d 652, 654 (1973) (quoting A.B.A. Standards Relating to the Function of the Trial Judge § 1.7, Approved Draft, 1972). We share in the Supreme Court's awareness that "the appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of these elements." *Id.*

**3.** The cases cited by appellant are memorandum decisions, which cannot be cited by parties to an action *for any purpose. Major v. Major,* 359 Pa.Super. 344, 356, 518 A.2d 1267, 1274 (1986) (emphasis added); *Commonwealth v. Kelliher,* 325 Pa.Super. 228, 472 A.2d 1091 (1984).

 The record before us indicates a predetermined policy with respect to sentencing drug offenders and we thus find that appellant has adequately supported his allegations of personal bias against a "particular class of litigants." We also are of the opinion that the personal bias alleged was of such nature and intensity so as to prevent Mr. Lemanski, once convicted, from obtaining a sentence uninfluenced by the court's prejudgment of drug offenders generally. We emphasize that a defendant is entitled to a trial before a judge who is not biased against him at any point of the trial, and most importantly, at sentencing. *See U.S. v. Thompson*, 483 F.2d 527, 529 (3d Cir.1973). *See also Commonwealth v. Batterson*, 286 Pa.Super. 428, 435, 429 A.2d 13, 17 (1981) (Brosky, J. concurring) (sentencing of convicted persons requires an open, unprejudiced, not predetermined view by the trial judge of each individual defendant).

This Court has previously expressed its concern with the drug problem our country faces, and we recognize its debilitating effects at every level of our society. We recognize also that the "weekend user," despite his fatuous rationalizations, cannot disassociate himself from the source or effects of illegal drug use. He is aligned with the kingpin of a major drug ring, and with the street dealer who invades our grade schools and high schools. There is no middle ground, and, despite the temptation, we can have no greater compassion for one than for the other. We, as jurists, are committed to impartiality. But if we allow our personal opinions and goals to cause us to manipulate the law, our commitment is no longer credible, no matter how righteous our purpose. Under the circumstances of this case, it is clear that the trial judge's impartiality could reasonably be questioned. We therefore find that Judge Fink abused his discretion by not recusing himself.

## II

 Appellant's second issue presented for review is whether the court erred in not granting recusal after its

rejection of a plea, agreement, agreed to by appellant and the Commonwealth, and the withdrawal of a guilty plea. Although our discussion in Part I precludes the necessity to address this issue, we find that denial of this motion was an abuse of discretion. *See Commonwealth v. Evans,* 434 Pa. 52, 56 n. *, 252 A.2d 689, 691–692 n. * (1969) ("if a judge refuses to accept a plea bargain agreed to by the defense and the Commonwealth, or if a plea of guilty ... is withdrawn because the trial judge decides that his original agreement was inappropriate, then the trial should be held where practical before another judge who has no knowledge of the prior plea bargaining").

## III

The next question presented is whether law officers' observation of a greenhouse by means of binoculars specially equipped with a zoom lens violated appellant's Fourth Amendment protection against unreasonable searches and seizures.

Appellant's house is one of the last residences on Reese Hollow Road, a dead-end, dirt road in a rural area. The road is approximately 200 feet from the house. Based in part on observations made from the road with the aid of binoculars and a zoom lens, a search warrant was issued. Appellant contends the trial court erred in denying his motion to suppress marijuana seized pursuant to this warrant. He claims that the use of binoculars and a zoom lens, prior to issuance of the warrant, constituted a search in violation of the Fourth Amendment, and thus the evidence seized pursuant to the warrant should have been suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *Commonwealth v. Whitaker,* 461 Pa. 407, 336 A.2d 603 (1975).

In reviewing a motion to suppress, we must determine whether the record supports the factual findings of the suppression court, as well as determine the reasonableness of the inferences and legal conclusions drawn therefrom.

In determining whether the record supports the court's findings of fact, we must accept the Commonwealth's evidence and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Weik,* 360 Pa.Super. 560, 562, 521 A.2d 44, 45 (1987); *Commonwealth v. Eliff,* 300 Pa.Super. 423, 428–29, 446 A.2d 927, 929–30 (1982).

Appellant has not excepted to the suppression court's findings of fact. Therefore, we need only determine the reasonableness of the court's inferences and legal conclusions.

At the suppression hearing, Trooper Cogley testified on direct examination as follows:

Q. Now, can you recall any particular dates when this first came to your attention?

A. This particular incident first came to my attention sometime around the first of October.

Q. And, how did that occur?

A. An informant advised me that something other than what appeared to be normal vegetation was growing at a property on Reese Hollow which turned out to be Lemanski's home.

Q. When you received the information something other than normal vegetation, did that bring anything to your mind?

A. I questioned this person and they had a feeling it might be marijuana.

Q. Now, to your knowledge, did this person have any experience or expertise in determining what marijuana is?

A. No.

Q. As a result of this information, did you do anything specifically related to that? Did you act upon that information?

A. Yes, I made several trips past the Lemanski home, driving while on duty and seeing what I could view. It had been reported that this was growing in a green-

house attached to the front of their home. I could see something that looked unusual to me.

Q. Now, when you said you could see, can you estimate what distance and can you tell us where you were positioned when you could see this?

A. We're still talking about the first time I was up there, right?

Q. Yes, your first initial time.

A. It was from the road in front of their house which is approximately 200 feet. I viewed from the road several times. I felt it was marijuana.

Q. Now, Trooper Cogley, have you had any kind of schooling or training in the areas of detecting specific drugs or growing—the growing of marijuana?

A. I've had no schooling, I've had, I guess we would call it on-the-job training and experience in dealing with marijuana through making marijuana arrests and in dealing with the strike force. I know what marijuana is, I know what it looks like.

Q. So, after you received this initial information, you then made your own observations, is that correct?

A. Yes, ma'am.

Q. And, this occurred in the early part of October?

A. Yes.

Q. Now, did there come a time when you attempted to obtain a search warrant to search the home that you were observing?

A. Yes, on the 16th of October I was informed by another person that there was allegedly marijuana growing in the greenhouse at the Lemanski residence.

Q. What part of the day did you receive that information, if you can recall, before noon?

A. It was around noon.

Q. Did you act upon that information in any way?

A. Yes, I did.

Q. What did you do?

A. Myself and Officer Mohler drove up.

. . . .

We drove up in my unmarked police car and made another viewing on this property from the road that I mentioned before.

Q. And that—

A. We were using binoculars, the plants had grown substantially since my earlier visit, they were sticking out the top of the greenhouse, there was no question in my mind that this was marijuana.

Q. Can you estimate how tall the greenhouse is itself?

A. Eight to ten feet.

Q. And, you're saying that you could see this plant growing out of the roof of that?

A. Yes, you could view it through the glass and it was coming out through a panel that was removed from the top of the greenhouse.

Q. Could you describe the home that you've referred to in terms of physical characteristics?

A. It's a two-story fairly new home, it has wood siding on it with a greenhouse attached to the front nearest the road and from the house he would get into the greenhouse from a sliding—probably six-foot sliding glass door. . . .

On cross-examination, Trooper Cogley testified as follows:

Q. Wouldn't it be fair to say, sir, that these were not just regular binoculars, these were binoculars with zoom lens used particularly in law enforcement?

A. Yes, sir.

■■■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV; Pa. Const. art. 1, § 8. A search within the meaning of the Fourth Amendment "occurs when 'an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985) (quot-

ing *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). Whether or not a person who invokes the protection of the Fourth Amendment may claim a "reasonable expectation of privacy" is determined by two inquiries: (1) whether, by his conduct, the person has "exhibited an actual (subjective) expectation of privacy;" and (2) whether that expectation of privacy is "one that society is prepared to recognize as reasonable." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

▉▉▉ It is now well established that a person cannot have a reasonable or justifiable expectation of privacy in things or activities which are generally visible from some public vantage point. *California v. Ciraolo,* 476 U.S. 207, —, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986). The Commonwealth contends that appellant had no reasonable or justifiable expectation of privacy in a glass-enclosed greenhouse. We disagree. The suppression court's findings do not support this conclusion.

The United States Supreme Court pointed out in *Rakas v. United States,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978):

> Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, *see* W. Blackstone, *Commentaries,* Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

439 U.S. at 143 n. 12, 99 S.Ct. at 431 n. 12; *see also Commonwealth v. Lowery,* 305 Pa.Super. 66, 451 A.2d 245 (1982) (property rights, actual usage, and historical distinc-

tions are all used to determine whether the Fourth Amendment protection applies).

Appellant's greenhouse was attached to his home, and was accessible from the dining room through a sliding glass door.[4] As noted above, appellant's house is situated 200 feet from the end of a dead-end, dirt road in a rural area. Little could be seen inside Lemanski's greenhouse from the road. This setting does not invite casual intrusion; the location of the home and the greenhouse is a clear indication to us of appellant's expectation of privacy.

We next determine whether that expectation is one that society is prepared to recognize as reasonable. In pursuing this second inquiry, the test is not whether the individual chooses to conceal assertedly "private activity," but whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment. *Ciraolo,* 476 U.S. 207, ——, 106 S.Ct. 1809, 1812. Protection of privacy in the home is the heart of the Fourth Amendment. "The Amendment reflects the recognition of the Founders that certain enclaves should be free from arbitrary government interference ... [T]he [United States Supreme] Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984) (citing *Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980)). The Fourth Amendment reflects a choice that our society should be one in which citizens "dwell in reasonable security and freedom from surveillance." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). A police officer parting shrubbery and peering through binoculars into one's home is certainly an intrusion which infringes upon the values protected by the Fourth Amendment.

4. Looking into the greenhouse, one necessarily views the adjacent dining room, risking the possibility of intruding on the intimate details of everyday life. *Cf. United States v. Dunn,* —— U.S. ——, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

The suppression court stated that "anything growing in the greenhouse ... could have been viewed by the postman, the delivery boy, the newspaper boy or any other non-official party who would ordinarily come to the front door of the defendants' residential dwelling." This is obvious; however, it does not justify a police officer's use of binoculars and a zoom lens from a distance of 200 feet. The Fourth Amendment was not intended to protect citizens from the curious eyes of delivery boys or mere passersby. The history of the Fourth Amendment teaches us otherwise.[5] Those who wrote the Bill of Rights were determined that citizens be forever free from unbridled *official* intrusion:

> Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as "the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book," because they placed "the liberty of every man in the hands of every petty officer."

*Stanford v. Texas,* 379 U.S. 476, 481, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965).

In *Ciraolo,* the Supreme Court granted certiorari to determine whether the Fourth Amendment is violated by warrantless aerial observations from an altitude of 1,000 feet of a fenced-in backyard within the curtilage of the home. A sharply divided Court determined that, although the defendant had clearly exhibited a subjective expectation of privacy, the mere fact that he had taken measures to restrict some views of his illegal agricultural pursuits did not preclude an officer's observations from a public vantage

5. The familiar history of the Fourth Amendment is recounted in *Payton v. New York,* 445 U.S. 573, 583–85, 100 S.Ct. 1371, 1378–79, 63 L.Ed.2d 639 (1980).

point where he has a right to be and which renders the activities clearly visible. 476 U.S. at ——, 106 S.Ct. at 1812. The majority concluded that:

[i]n an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye.... The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the *naked* eye.

476 U.S. at ——, 106 S.Ct. at 1813 (emphasis added).[6]

 The instant case is clearly distinguishable. It is undisputed that the greenhouse in question is within the "curtilage" area.[7] The curtilage area surrounding a private house is entitled to protection under the Fourth Amendment as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept. *Dow Chemical Co. v. United States,* 476 U.S. 227, ——, 106 S.Ct. 1819, 1827, 90 L.Ed.2d 226 (1986). Unlike *Ciraolo,* the contents of the greenhouse were not, as the Commonwealth contends, exposed to public view. To the contrary, in order to view the greenhouse, Trooper Cogley testified that he

6. Justice Powell disagreed:

Technological advances have enabled police to see people's activities and associations, and to hear their conversations, without being in physical proximity. Moreover, the capability now exists for police to conduct intrusive surveillance without any physical penetration of the walls of homes or other structures that citizens may believe shelters their privacy.

476 U.S. at ——, 106 S.Ct. at 1815 (Powell, J., dissenting).

Justice Powell concluded that the majority failed to make a significant distinction between official aerial surveillance and the electronic surveillance against which the *Katz* Court had warned. Justice Powell noted that although the right of privacy in the home and its curtilage includes no right to engage in unlawful conduct there, the Fourth Amendment requires police to secure a warrant before they may intrude on that privacy to search for evidence of a suspected crime. *Ciraolo,* 476 U.S. at —— n. 11, 106 S.Ct. at 1819 n. 11. *See also United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

7. The Oxford English Dictionary defines curtilage as "the area attached to and containing a dwelling-house and its out-buildings." 2 Oxford English Dictionary 1278 (1933).

had to find an opening in the brush and shrubbery along the property line of the house. In addition, Trooper Cogley had to use much more than his naked eye to view the contents of the greenhouse.

In finding Lemanski's expectation of privacy to be reasonable, we emphasize that the Fourth Amendment makes no distinctions between lawful and unlawful conduct. We cannot, in hindsight, choose to protect unlawful conduct with less vigor. Rather, we must balance legitimate law enforcement techniques and the legitimate privacy rights of citizens in a free and open society.

Our Supreme Court recently characterized this delicate balance as follows:

> To maintain freedom for all we must maintain an ordered society, which requires that we effectively enforce our laws. Thus, the strictures that are to be applied to preserve our freedom must never be allowed inadvertently to provide the vehicle for undermining it. Of equal concern is that we guard against surrendering in fear, in a perceived lawless era, fundamental protections that are essential to the preservation and maintenance of our free society.

*Commonwealth v. Miller,* 513 Pa. 118, 127–128, 518 A.2d 1187, 1192 (1986).

We conclude that the actions taken by Trooper Cogley and Officer Weidner were sufficiently intrusive so as to constitute an infringement upon appellant's legitimate expectation of privacy.

In addition, the officers' subsequent entry onto Lemanski's property for the purpose of observing the greenhouse at close range was also unconstitutional. When police officers who are "justifiably at the scene [see] contraband in plain view," the observation "is not a search within the meaning of the Fourth Amendment ... [and] no warrant is required." *Commonwealth v. Getz,* 236 Pa.Super. 469, 472, 344 A.2d 686, 687 (1978) (citations omitted). The Commonwealth argues, and the trial court held, that the search was

lawful because the officers were legitimately on Lemanski's property and saw the marijuana plants in "plain view."

The plain view doctrine encompasses two distinct types of cases. The first type is that in which the "view" takes place after an intrusion into a constitutionally protected area. "[I]f the original intrusion is justified, such as by consent, hot pursuit, warrant or other, objects sighted in plain view will be admissible, so long as the view was inadvertent." *Commonwealth v. Weik*, 360 Pa.Super. 560, 564, 521 A.2d 44, 46 (1987). The second type of case is that where the view takes place before any intrusion into a constitutionally protected area.[8]

Based on our finding above that Lemanski's greenhouse is a constitutionally protected area, the instant case falls into the first category. The officers entered onto Lemanski's property, approached the greenhouse, and peered into it. All of this was done without a warrant, without consent, and without exigent circumstances. Their intrusion was not justified, nor was their "view" inadvertent. *See Weik, supra; Commonwealth v. Adams*, 234 Pa.Super. 475, 341 A.2d 206 (1975). We therefore conclude that the "plain view" doctrine is inapplicable here, and the warrantless search was in violation of Lemanski's constitutional rights.

Warrantless searches are, "subject only to a few specifically established and well-delineated exceptions," per se unreasonable and are therefore prohibited by the Fourth Amendment. *Katz*, 389 U.S. at 357, 88 S.Ct. at 514; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971); *cf. Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1979) (no reasonable expectation of privacy in contents of commercial building in urban setting where windows are uncurtained; court held law enforcement's use of binoculars was not a violation of the

8. For further discussion on the distinction between these two types of cases, *see Commonwealth v. Weik, supra,* and *Commonwealth v. Chiesa,* 329 Pa.Super. 401, 478 A.2d 850 (1984).

Fourth Amendment).[9] To the extent that the officers used binoculars to identify objects or activities that could not be identified with the naked eye and to the extent that the officers violated the appellant's expectation of privacy by their unjustified intrusion, those observations were unconstitutional without a search warrant and could not form the basis for issuance of the warrant.

The question then becomes whether the untainted information in the affidavit establishes probable cause for a search warrant to issue. *See Commonwealth v. Cosby,* 234 Pa.Super. 1, 335 A.2d 531 (1975); *Commonwealth v. Soychak,* 221 Pa.Super. 458, 289 A.2d 119 (1972). Striking the tainted information, Trooper Cogley's affidavit states as follows:

> Affiant received information from a reliable citizen informant, a person known to the Affiant to be reliable, that marijuana was seen by this informant growing in a greenhouse or sun room attached to the residence of the above named owners or occupants. This person is familiar with the identification of such plants. Based upon that information Affiant drove past on the public roadway at the premises to be searched and observed the plant growing through the roof of the greenhouse. [ ] Thereafter, Affiant and Officer Weidner spoke with another reliable citizen informant who is known to the Affiant and Officer Weidner to be a reliable source, who advised that he had observed what he believed to be marijuana growing at the premises described. [ ] The information herein described was first received from the first described informant approximately two (2) weeks before the date of this application for search warrant. The balance of the probable cause was received on the date hereof. Both of the informants herein described are mature, respected, em-

9. Judge Montgomery dissented, stating that "the unnatural physical penetration into the normal line of sight occupied by a person" should be disallowed. 216 Pa.Super. 177, 183, 263 A.2d 904, 908. We note also that the observations in *Hernley* occurred in 1967, and the court found that *Katz,* which was decided in 1969, was given wholly prospective application.

ployed, citizens of long standing within this community, with no known prior criminal record and thus are believed by Affiant as well as Officer Weidner to be reliable.

 The standard for evaluating whether probable cause exists for the issuance of a search warrant is the "totality of circumstances" test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This test was adopted as the law of Pennsylvania in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (decided Dec. 11, 1985, as amended Feb. 5, 1986). *See also Commonwealth v. Price*, 318 Pa.Super. 240, 464 A.2d 1320 (1983).

 Here, both informants are unnamed. A tip from an unnamed informant can properly form the basis for probable cause to issue a search warrant, provided there is adequate evidence of the informant's reliability. *Commonwealth v. Melilli*, 361 Pa.Super. 429, 522 A.2d 1107 (1987); *Commonwealth v. Carlisle*, 348 Pa.Super. 96, 100, 501 A.2d 664, 666 (1985). Our supreme court recently reiterated the requirement that the reliability of the informant's information must be determined from the facts supplied by the police official. *See Commonwealth v. Miller*, 513 Pa. at 134, 518 A.2d at 1195. Here, there is no allegation that either informant gave prior reliable information, nor is there any allegation that the statements were against the informants' penal interests. Further, there is no indication that appellant's reputation supports the informants' tips, nor that the tips were adequately corroborated by an independent source (i.e., independent police work). *See Commonwealth v. Gray*, 322 Pa.Super. 37, 48, 469 A.2d 169, 174 (1983).

The affiant alleges no facts or underlying circumstances from which the informants had concluded that the plants were marijuana.[10] The informants merely "suspected" the

10. Our reading of the record, in particular the testimony of Trooper Cogley at the suppression hearing, reveals a contradiction of Trooper Cogley's allegation in the affidavit that the informant was "familiar with the identification of such plants." We emphasize that the possibility of official misconduct in the drafting of an affidavit is a serious consideration, *see Commonwealth v. Miller*, 513 Pa. 118, 518 A.2d 1187

plants were marijuana. We have no specific, objective facts, but rather mere affirmance of belief. Mere affirmance of belief gives rise only to suspicion, not to probable cause. *Commonwealth v. Davis*, 225 Pa.Super. 242, 246–47, 310 A.2d 334, 337 (1973). *See also Arizona v. Hicks*, — U.S. —, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (probable cause is required to invoke the plain view doctrine). We also reject the affiant's endeavor to establish the informants' reliability by asserting that they were "mature, respected, employed, citizens of long standing within this community, with no prior record...." *See In re Burton*, 259 Pa.Super. 20, 393 A.2d 696 (1978) (no probable cause where only reasons to believe informant were that he had "nothing to gain by informing" and came from a family of "noted upstanding citizens of the community").

 An informant's report "which itself fails to establish probable cause may be sufficiently corroborated by independent observation of a suspect's conduct, if the latter *tends to confirm the information* in the report or otherwise to support a conclusion that the suspect is engaged in committing a crime." *Commonwealth v. Corleto*, 328 Pa.Super. 522, 527, 477 A.2d 863, 865–66 (1984) (quoting *United States v. Acarino*, 408 F.2d 512, 515 (2d Cir.1979)). We are unwilling to attribute significance to Trooper Cogley's initial observation of the greenhouse from the public road with his *naked* eye. At that time, Trooper Cogley saw a "plant growing through the roof of the greenhouse." This is insufficient to confirm the informant's report and we are thus unable to uphold a finding of probable cause. *Cf. Commonwealth v. Baker*, 513 Pa. 23, 518 A.2d 802 (1986); *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985); *Commonwealth v. Jones*, 506 Pa. 262, 484 A.2d 1383 (1984); *Commonwealth v. Chandler*, 505 Pa. 113, 477 A.2d 851 (1984); *Commonwealth v. Johnson*, 358 Pa.Super. 435, 517 A.2d 1311 (1986); *Commonwealth v. Way*, 342 Pa.Super.

(1986) and *Commonwealth v. Hall,* 451 Pa. 201, 302 A.2d 342 (1973), and is one of the abuses at which the judicially created exclusionary rule was aimed.

341, 492 A.2d 1151 (1985); *Commonwealth v. Ensminger*, 325 Pa.Super. 376, 473 A.2d 116 (1984).

Viewed in its totality, we conclude that the affidavit is insufficient to establish probable cause, and we therefore reverse the trial court's order denying suppression.

## IV

Appellant alleges that the trial court erred in denying him the right to introduce character evidence as to his reputation for honesty and integrity. Appellant contends that by taking the stand he automatically placed his credibility at issue, and, as such, he should have been given the opportunity to present a character witness.

Appellant cites several cases to support his contention. In *Commonwealth v. Stafford*, 272 Pa.Super. 505, 416 A.2d 570 (1970), the defendant was convicted of theft. At trial, the Commonwealth introduced evidence that police officers were called to the scene of a furniture store and, upon arrival, saw broken glass by a large door. The officers saw someone moving about inside the store and observed the defendant carrying a portable television out of the store. The defendant testified that he was inside the store because he had been pushed through the plate glass window of the store during a fight. He denied carrying the television. Clearly, the defendant's testimony directly contradicted the Commonwealth's evidence and therefore the defendant's credibility was directly at issue.

Appellant also cites *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607 (1981). In *Scott*, the appellant was convicted of third-degree murder. The Commonwealth presented testimony to rebut appellant's claim of provocation, and, to rebut this, appellant claimed self-defense. Since appellant's reputation for honesty was essential to his defense, the court properly admitted the character evidence.

▆ The case before us, however, is unlike those appellant cites. Mr. Lemanski's testimony was not in direct conflict with that presented by the Commonwealth. Appel-

lant admitted to growing and possessing marijuana. Consequently, appellant's credibility was not directly at issue. The appellant's good character for the trait of honesty was determined by the trial court to be irrelevant to the crimes for which he was charged. We agree with the trial court that "honesty is not inherent or relevant on the charge of manufacturing ... or possessing drugs." *See Commonwealth v. Stefanowicz*, 118 Pa.Super. 79, 179 A.2d 770 (1930) (the relevancy of character evidence may be limited to the particular trait or traits of character involved in the commission of the crime charged); *see also Commonwealth v. Knox*, 172 Pa.Super. 510, 94 A.2d 128 (1953) (where the sole question is whether the defendant performed the act forbidden by law, his character is not in issue for any purpose, and evidence of his good reputation for some trait or another may be properly excluded).

## V

Appellant argues that the trial court erred in denying him the right to cross-examine the co-defendant. Appellant and his wife were co-defendants at trial, and were represented by separate counsel. Appellant testified on his own behalf. Thereafter, Mrs. Lemanski testified on her own behalf and was cross-examined by the Commonwealth. Appellant's trial counsel then attempted to cross-examine her, but the trial court precluded him from doing so. Appellant claims this was an abuse of the trial court's discretion.

The Sixth Amendment provides that an accused "[i]n all criminal prosecutions ... shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; Pa. Const. art. 1, § 9. The right of confrontation imports the accused's constitutional privilege to cross-examine witnesses against him. The purpose of the confrontation clause is to provide an accused with effective means of challenging evidence against him by testing recollection and probing the conscience of an adverse witness. *Commonwealth v. Robinson*, 507 Pa. 522, 525, 491 A.2d 107, 109 (1985).

 Undoubtedly, if a party testifies in his own behalf and incriminates his co-defendant, the latter should be extended the right of cross-examination. *See Commonwealth v. McDowell,* 460 Pa. 474, 478, 333 A.2d 872, 874–75 (1975); *State v. Crooker,* 123 Me. 310, 122 A. 865, 33 A.L.R. 821 (1923). However, here the testimony of the co-defendant did not incriminate appellant. On the contrary, if believed, Mrs. Lemanski's testimony corroborated appellant's testimony and exonerated him insofar as the delivery charge was concerned. We are of the opinion that the co-defendant's testimony was more favorable than any that cross-examination could possibly have produced. *See Commonwealth v. Harvey,* 263 Pa.Super. 121, 397 A.2d 430 (1979). Hence, we find no merit to appellant's argument that he was denied his constitutional right to confront witnesses against him.

## VI

Appellant claims that the trial court erred in refusing to grant a mistrial after the district attorney told the jury in her closing argument that they need not accept a stipulation that the marijuana was for appellant's personal use. Appellant also claims that the court erred in its instructions to the jury with respect to this stipulation.

A stipulation is a statement that the fact agreed upon is proven. *Commonwealth v. McMurray,* 198 Pa. 51, 59, 47 A. 952, 953 (1901). Prior to trial, the Commonwealth and defense counsel entered into a stipulation which stated, *inter alia,* that the marijuana in question was for "personal use." At trial, the prosecution stated: "This is a stipulation of fact that's been entered into between the Commonwealth, me, and the counsel for each of the defendants.... The marijuana was grown for personal use." However, in closing, the prosecution stated: "[T]he mere fact that the stipulation exists doesn't preclude you from looking at other facts.... We know, or we would guess, that a personal use would require a much smaller amount of marijuana...."

Thereafter, the court instructed the jury as follows: "[Y]ou alone must determine what is meant by 'personal use' under the circumstances.... I would guess that I could deliver it to others if I wanted to and that would still be for personal use." Appellant's counsel objected to the aforementioned statements.

A valid stipulation is to be enforced according to its terms. The parties are bound to accept the facts to which they have stipulated, and the remedy for violation of the stipulation is reversal. *Commonwealth v. Mathis*, 317 Pa.Super. 226, 232, 463 A.2d 1167, 1171 (1983); *see also Pa. Suggested Standard Criminal Jury Instructions*, § 3.17 (November 20, 1971). We question the trial court's interpretation of the term "personal use," and the prosecutor's disregard of the stipulation. However, we emphasize that appellant was found guilty of possession of a controlled substance [11] and manufacture [12] of marijuana. Appellant was found *not* guilty of possession with intent to deliver.[13] We therefore find the court's error to be harmless.

## VII

Appellant contends that any further proceedings in this matter should be remanded to a different judge, re-

**11.** 35 P.S. § 780–113(a)(1), (16). We are careful to distinguish between simple possession of a controlled substance and possession with intent to deliver. *See Commonwealth v. Davis*, 331 Pa.Super. 285, 480 A.2d 1035 (1984).

**12.** Manufacturing is defined in 35 P.S. § 780–102(b):

the production, preparation, propagation, compounding, conversion or processing of a controlled substance, other drug or device or the packaging or repackaging of such substance or article, or the labeling or relabeling of the commercial container of such substance or article, but does not include the activities of a practitioner who, as an incident to his administration or dispensing such substance or article in the course of his professional practice, prepares, compounds, packages or labels such substance or article. The term "manufacturer" means a person who manufactures a controlled substance, other drug or device.

**13.** Deliver is defined in 35 P.S. § 780–102(b): "the actual, constructive, or attempted transfer from one person to another of a controlled substance...."

gardless of the outcome of the other issues in this appeal. We agree.

The appellant's original argument centers upon the fact that appellant's counsel has already testified before the Judicial Inquiry and Review Board regarding two incidents related to this proceeding involving Judge Fink. This testimony can only be construed as negative toward Judge Fink. Also, in a post-submission memorandum, filed December 3, 1986, the appellant presented several new developments to be considered: (1) Judge Fink has been temporarily suspended from hearing cases; (2) Judge Fink has subpoenaed the appellant and the appellant's wife (co-defendant at trial who was acquitted) to testify at the Judicial Inquiry and Review Board proceedings; and (3) Judge Fink has also subpoenaed the assistant district attorney of Potter County, who prosecuted the case at trial and argued before this court.

The Code of Judicial Conduct requires that a judge "disqualify himself in a proceeding in which his impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3, subd. (C)(1)(a). The Code also enumerates specific situations in which a judge should disqualify himself, including when "he has a personal bias or prejudice concerning a party...." Code of Judicial Conduct, Canon 3, subd. (C)(1)(a). As we stated above, the facts clearly present a reasonable question concerning Judge Fink's impartiality and thus the appellant is entitled to further proceedings before another judge. *See Reilly by Reilly v. Southeastern Pa. Transp. Auth.*, 507 Pa. 204, 489 A.2d 1291 (1985); *Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983).

Reversed and remanded for a new trial. Jurisdiction relinquished.

POPOVICH, J., files a concurring and dissenting opinion.

POPOVICH, Judge, concurring and dissenting:

I would dissent to that portion of the Majority Opinion holding that the police's use of binoculars to view the

appellant's marijuana plants growing out of his greenhouse was violative of the Fourth Amendment's prohibition against intrusion into one's legitimate expectation of privacy.

The Majority recounts how the police officer initially spied the plants as he drove past the appellant's residence, on routine patrol, and observed their growth without the aid of any artificial enhancement to his vision to make the sighting.

One must not forget that the Fourth Amendment is intended to protect people and not places. *Katz v. U.S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). With the preceding in mind, my reading of the U.S. Constitution and cases interpreting the Fourth Amendment is not as restrictive as the Majority's so as to proscribe the use of binoculars to peer into one's home, especially when the glass enclosing the greenhouse invited the prying eye of anyone, including the police, to view its contents.

Like an undrawn curtain, the clear pane of glass enclosing the greenhouse prohibited no one from seeing what occurred inside. The fact that one had to use artificial means to secure a confirmation of what the officer at first believed to be a controlled substance growing out of the roof of the greenhouse does not brand the conduct "intrusive". Therefore, I cannot endorse a finding by the Majority that the appellant had a "reasonable" expectation of privacy of the contents of his greenhouse.

If such were the case, then in no instance where the police used, e.g., an infra-red camera to video tape the conduct of criminals carried out under the cover of darkness would be admissible in a court of law. I do not believe the Fourth Amendment was intended to preclude the use of information obtained with artificial means (i.e., binoculars, infra-red cameras etc.), for what anyone does for all to *see* is not a matter which invokes the shield of the Fourth Amendment.

It would be as if an individual viewed the commission of a crime, be it through a telescope, and the law, under the

Majority's reading of the Constitution, would insulate the guilty party from prosecution because the information/evidence was tainted by its securement by artificial means. This would truly stretch the fibers of the parchment upon which the Constitution is written in giving refuge to those not entitled to the mantle of protection afforded by such a document.

Further, I cannot join in the Majority's conclusion that the probable cause section of the search warrant was defective.

My reading of the warrant discloses its compliance with the "totality of circumstances" test enunciated by our Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Accordingly, I would find the document passes constitutional muster.

Lastly, I disagree with the Majority's conclusion that the appellant was not prejudiced when he was not permitted to cross-examine his co-defendant or present character witnesses who would testify to his truth and veracity. Both denials are unpardonable and require rectification in the form of a new trial.

For the reasons stated above, I respectfully dissent in part.