547 A.2d 387

COMMONWEALTH of Pennsylvania, Appellee,

v.

Joseph OGLIALORO, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 2, 1987.

Filed Sept. 1, 1988.

318

Ronald H. Elgart, Levittown, for appellant.

Stephen B. Harris, Assistant District Attorney, Warrington, for Com., appellee.

Before BECK, KELLY and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of sentence which was imposed upon appellant, Joseph Oglialoro, after he was convicted by a judge, sitting without a jury, of certain drug offenses. These offenses are possession of a controlled substance, possession with intent to deliver, and possession of drug paraphernalia.

Appellant contends that the helicopter search which was conducted by the police was illegal because it interfered with appellant's reasonable expectation of privacy. Appellant also contends that his pretrial motion to suppress should have been granted, and the fruits of the illegal search should have been suppressed. We agree and must reverse the judgment of sentence and grant a new trial.

The standard of review which governs a ruling on a motion to suppress has been set forth below:

> In reviewing a motion to suppress, we must determine whether the record supports the factual findings of the suppression court, as well as determine the reasonableness of the inferences and legal conclusions drawn therefrom. In determining whether the record supports the court's findings of fact, we must accept the Commonwealth's evidence and so much of the evidence of the

defense as, fairly read in the context of the record as a whole remains uncontradicted. *Commonwealth v. Weik*, 360 Pa.Super. 560, 562, 521 A.2d 44, 45 (1987); *Commonwealth v. Eliff*, 300 Pa.Super. 423, 428–29, 446 A.2d 927, 929–30 (1982).

*Commonwealth v. Lemanski*, 365 Pa.Super. 332, 342–343, 529 A.2d 1085, 1089 (1987).

In the instant case, the factual findings of the suppression court are supported by the record; however, we are unable to agree with the legal conclusions drawn from that record. The factual findings of the suppression court consisted of the following:

Appellant is the owner of a certain tract of land located in a rural area in Bucks County which tract contains, inter alia, the dwelling of defendant and his family and the pole-barn in which the marijuana was discovered. (N.T. pp. 85–86). Appellant's property is bounded by Durham Road on one side, and by trees and shrubs on the other three sides. (N.T. pp. 89–90 and Exhibit DS–8). A fence extends along the rear of half of one side. (N.T. p. 89). The pole-barn which contains the marijuana is located at the rear of appellant's property, approximately 446 feet from the road, and 251 feet from defendant's residence. (N.T. pp. 87–88). It is a windowless wooden structure, known as a "pole-barn", (N.T. pp. 7, 21) and measures approximately 31 feet by 48 feet. (N.T. p. 88). The material used to construct the barn's roof is a clear plastic-type substance. (N.T. pp. 7, 21; Exhibit DS–26). However, it appears somewhat milky and translucent due to the fact that it is corrugated and is molded into rippled, rather than smooth, sheets.

On October 11, 1985, Pennsylvania State Police at the Trevose Barracks received an anonymous telephone tip, allegedly from a private aircraft pilot, reporting the presence of marijuana in the defendant's pole-barn. (N.T. p. 15). Acting on the tip, three police officers flew over the premises in a State Police helicopter on October 16, 1985. (N.T. pp. 33, 15). The day was bright and sunny. (N.T.

p. 40). The helicopter initially flew over appellant's property at a height of approximately 500 feet above the appellant's barn. However, the police were unable to ascertain the barn's contents at that altitude and therefore reduced their altitude to approximately 50 feet over the barn. (N.T. pp. 23–24). The police were not using any visual aids to assist their observations. (N.T. pp. 33, 47). While hovering at 50 feet, police observed the tops of plants which were pressed against the barn's roof, and which clearly matched the color, size and configuration of marijuana. (N.T. pp. 24, 56–57). The police helicopter hovered at a height of 50 feet for approximately 15 seconds and made a total of three or more passes over defendant's property, lasting approximately five minutes. (N.T. pp. 25, 32, 45). Appellant's wife was present in the home at the time. (N.T. p. 93). She experienced various sensations caused by the helicopter's proximity, such as loud noise, and vibration of the house and windows. (Id.) After clearly identifying the marijuana from an altitude of 50 feet over the barn (N.T. pp. 63–64), the helicopter returned to the State Police Barracks. On the basis of the officers' aerial observations, the local police chief proceeded to obtain a search warrant (N.T. pp. 25–26), while other officers drove to the site to secure the property in the interim. (N.T. p. 26).

The officers participating in the aerial viewing had significant training and experience in the detection of marijuana. (N.T. pp. 29–30, 55). Marijuana has a precise and identifiable growing configuration (N.T. p. 30), and grows in a distinctive color, distinguishable from other vegetation growing in Pennsylvania. (N.T. pp. 47–48, 58–60). From an altitude of 500 feet it was possible to observe through the barn roof a color identical to the color of growing marijuana plants. (N.T. p. 39). At 50 feet, it was possible to identify, clearly as marijuana the leaves of a plant which were pressed against the barn roof. (N.T. p. 39). In general, it was possible to observe objects inside the barn through the roof, especially if the object was positioned close to the roof. (N.T. p. 39).

When the search warrant arrived, the police forcibly entered the barn and observed 91 very large marijuana plants. (N.T. p. 9, Exhibits CS–3, 13). The plants appear to have ranged in height between 12 and 18 feet tall, and some were stooped over and pressed against the barn's roof. (Exhibits CS–3, 13). Trial Court's Opinion pp. 1–4.

With these facts in mind, the inquiry becomes whether appellant had a "constitutionally protected reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J. Concurring). *Accord California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).

There is no doubt that appellant had a subjective expectation of privacy since he did take precautions to maintain privacy. Further, a review of the law in this area reveals that appellant's subjective expectation is one that society is prepared to recognize as reasonable. *Katz, supra.*

The case of *People v. Sabo,* 185 Cal.App.3d 845, 230 Cal.Rptr. 170 (1986), *cert. denied, California v. Sabo,* —— U.S. ——, 107 S.Ct. 2200, 95 L.Ed.2d 855 (1987) is instructive in our analysis.

In *Sabo,* the police observed marijuana plants growing inside a 15′ × 10′ greenhouse which was located in a defendant's backyard during a routine helicopter patrol mission.

The helicopter was hovering at 400–500 feet during the time of the observation. Several roof and side panels were missing from the structure, and a tall pine tree and heavy vegetation inhibited a direct view into the greenhouse. A search warrant was issued, and marijuana was seized during the search.

The California Court of Appeals concluded that the helicopter "views from non-navigable airspace of the marijuana glimpsed through the missing panels of the greenhouse constituted an invasion of privacy, and the seizure of the contraband under the warrant issued pursuant to the heli-

copter viewing violated respondent's Fourth Amendment rights." *Id.* at 854, 230 Cal.Rptr. at 176.

The California Court distinguished two United States Supreme Court cases, both decided on the same day, *California v. Ciraolo* and *Dow Chemical Co. v. The United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), which had concluded that no Fourth Amendment violations had occurred when the police observed activity from aircraft which had been flying within navigable airspace.

In *Ciraolo,* the marijuana was growing in a defendant's backyard and had been observed from a helicopter which was flying from a 1,000 foot altitude. The United States Supreme Court recognized that the defendant's field was within the curtilage because it was immediately adjacent to the suburban home and was surrounded by high double fences.

The *Ciraolo* court, however, said:

The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectation are most heightened.

*Id.,* 476 U.S. at 212–213, 106 S.Ct. at 1812, 90 L.Ed.2d at 216.

The court in *Ciraolo* concluded that the defendant's expectation of privacy was unreasonable and "is not an expectation that society is prepared to honor." *Id.* at 214, 106 S.Ct. at 1813, 90 L.Ed.2d at 217 (footnote omitted). The Court succinctly set forth its rationale:

The observations by Officers Shutz and Rodriquez in this case took place within public navigable airspace, see 49 U.S.C.App. § 1304 [49 U.S.C.S.Appx. § 1304], in a physically nonintrusive manner; from this point they were able to observe plants readily discernable to the naked eye as marijuana. That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant. Such observation is precisely what a judicial officer needs to provide a basis for a warrant. Any member of the public flying

in this airspace who glanced down could have seen everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor.

*Id.*

In *Dow Chemical v. United States, supra,* the United States Supreme Court concluded that the taking of aerial photographs by the Environmental Protection Agency of Dow's chemical plant and facilities from an altitude of 2,000 feet did not implicate the Fourth Amendment.

The Court made the following conclusions:

... the open areas of an industrial plant complex with numerous plant structures spread over an area of 2,000 acres are not analogous to the "curtilage" of a dwelling for purposes of aerial surveillance; such an industrial complex is more comparable to an open field and as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras.

*Id.,* 476 U.S. at 239, 106 S.Ct. at 1827, 90 L.Ed.2d at 238. (footnote omitted).

By comparison, *People v. Sabo* distinguished both *Ciraolo* and *Dow.* In *Sabo,* the California Court of Appeals noted that in *Ciraolo, the marijuana was "easily visible to an observer from a fixed wing aircraft flying at 1,000 feet in navigable airspace." People v. Sabo,* 185 Cal.App.3d at 850, 230 Cal.Rptr. at 172. However, in *Sabo,* the greenhouse "was visible only to an eye in a circling helicopter positioned such as to enable a peek at the pot through the gaps." *Id.*

In discussing *Dow,* the California Court said that *Dow* had failed to "make any effort to protect against aerial surveillance" because there were open areas and no enclosed structures. *Id.* at 850, 230 Cal.Rptr. at 173. The *Sabo* Court also found crucial, a footnote which appeared in *Dow* which said the following:

"We find it important that this is not an area immediately adjacent to a private home, where privacy expectations are most heightened."

*Id.* (Quoting *Dow*, 476 U.S. at 237 n. 4, 106 S.Ct. at 1826 n. 4, 90 L.Ed.2d at 237 n. 4.)

Clearly, *Ciraolo* and *Dow* authenticate aerial surveillance taken within navigable airspace. Under 49 U.S.C.App. § 1304, a public right of transit exists through navigable airspace. The term "navigable airspace" is defined as that altitude above the minimum prescribed by the Civil Aeronautics Board. 49 U.S.C.App. § 1301(29).

The minimum safe aviation altitudes are set forth in 14 C.F.R. § 91.79 as follows:

**Minimum safe altitudes; general.**

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

(a) **Anywhere.** An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

(b) **Over congested areas.** Over any congested area of a city, town, or settlement, ... an altitude of 1,000 feet above the highest obstacle....

(c) **Over other than congested areas.** An altitude of 500 feet above the surface except over open water or sparsely populated area. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(d) **Helicopters.** Helicopters may be operated at less than the minimums prescribed in paragraphs (b) or (c) of this section if the operation is conducted without hazard to persons or property on the surface....

In the case before us, the officers, hovering in the helicopter at 500 feet, were unable with the naked eye to ascertain the contents of the pole barn. Consequently, they descended to 50 feet in order to gain a much improved view. Although the trial court specifically found that the pole barn was located within the curtilage, the court concluded that appellant forfeited his right to privacy because the roof

which appellant had installed was essentially a "window facing skyward." Trial Court's Opinion at 8. Additionally, the trial court concluded that, although federal regulations restrict *general* air traffic to 500 feet, there was a "regulatory exception to the 500 feet restriction for law enforcement purposes." *Id.* at 7.[1]

We are unable to agree with the trial court. In our view, the case before us is similar to *People v. Sabo, supra,* and, in fact, presents an even stronger case for suppression. We find that the legal principle enunciated in *Sabo* is persuasive and is also controlling here.

■■■ Although the federal regulations state that a helicopter may operate at less than minimum altitudes so long as no hazard results, 14 C.F.R. § 91.79(d), "it does not follow that such operation is conducted within navigable airspace." *People v. Sabo,* 185 Cal.App.3d at 852, 230 Cal.Rptr. at 174 (footnote omitted). If a helicopter hovering below the minimum altitudes specified in 14 C.F.R. § 91.79 is operated safely and does not constitute a hazard to persons or property on the ground, the aircraft is lawfully operated. However, a helicopter lawfully operated below the specified minimum levels is not in navigable airspace. See *Sabo,* 185 Cal.App.3d at 852, 230 Cal.Rptr. at 174–175. *Sabo* persuades us to conclude that merely operating a helicopter in a legal fashion does not automatically legitimize observations made therefrom.

In *Ciraolo* and *Dow,* the Supreme Court concluded *per se* that observation from an aircraft in navigable airspace is not an invasion of a reasonable expectation of privacy. Accordingly, if the observation is made from a helicopter operated in a lawful manner and hovering within navigable airspace, then the naked-eye aerial surveillance *per se* validates the search under the *Ciraolo–Dow* rationale. However, if the observation is made from a helicopter operated in non-navigable airspace (below the levels specified in 14

---

1. Instantly, the lower court failed to cite any authority for this legal proposition. However, we will assume the lower court was referring to 14 C.F.R. § 91.79(d).

C.F.R. § 91.79), then the observation is overly intrusive and violates the Fourth Amendment, even when the helicopter is operated in a lawful manner. *Sabo, supra.*

Instantly, we recognize that the helicopter was not hovering in navigable airspace at the time of their observation of contraband. Likewise, the *Sabo* court concluded that the helicopter was flying in nonnavigable airspace, distinguishing the case before it from *Ciraolo* and *Dow.* The *Sabo* court said:

> Finally, our conclusion recognizes the reality of helicopter aerial surveillance. To say any sighting from a helicopter in nonnavigable airspace validates a search warrant sanctions a broad range of aerial acrobatics performed in lawful manner but admittedly intrusive, such as an interminable hovering, a persistent overfly, a treetop observation, all accompanied by the thrashing of the rotor, the clouds of dust, and earsplitting din. Views from navigable airspace are far removed from the situs observed. The lawfully operated helicopter need stand back only such distance as not to hazard persons or property.

*Id.* at 854, 230 Cal.Rptr. at 175.

Because appellant had a constitutionally protected expectation of privacy from intrusion by the police which occurs through aerial observation from nonnavigable airspace, the seizure which resulted pursuant to the warrant violated appellant's rights under the Fourth and Fourteenth Amendments. Hence, the items which were seized and the photographs which were taken were the products of an illegally obtained search warrant.

Further, the plain view doctrine cannot justify the police officer's view of the pole barn. Because the pole barn is situated within a constitutionally protected area, the police officer's intrusion was not justified and cannot be an inadvertent view under the plain view doctrine. See *Commonwealth v. Lemanski,* 365 Pa.Super. at 351, 529 A.2d at 1094 (1987).

In conclusion, we hold that the evidence obtained as a result of the illegal search should have been suppressed. The judgment of sentence is reversed and a new trial is granted.

KELLY, J. filed a concurring opinion.

KELLY Judge, concurring:

I concur in the result. I agree that the act of hovering in a helicopter at an altitude of 50 feet within 251 feet of a residential building was under the circumstances of this case an unreasonable encroachment upon the vertical curtilage of appellant's home and his reasonable expectations of privacy within that zone; and therefore, observations from that vantage did not come within the plain view exception. *See generally California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Dow Chemical Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).

I am concerned, however, that the majority opinion may be read to preclude *any* helicopter surveillance conducted at altitudes of less than 1000 feet (*i.e.* the distance approved in *Ciraolo*. In *People v. Sabo*, 185 Cal.App.3d 845, 230 Cal. Rptr. 170 (1986), *cert. denied* — U.S. —, 107 S.Ct. 2200, 95 L.Ed.2d 855 (1987), the California appeals court held unconstitutional and suppressible observations made from a helicopter hovering briefly at an altitude of 400–500 feet. The structure being observed was located an unspecified distance from a residence in a suburban back-yard. Even assuming that *Sabo* was correctly decided, it's broad *dictum* that observations from levels below those specified in 14 C.F.R. § 91.79 (1000 feet in congested areas, 500 feet in non-congested areas) are *per se* unreasonable is not justified by the *Ciraolo* or *Dow Chemical Co.* decisions.

The question of precisely how far horizontal and vertical curtilage extends is problematic. I am unaware of any case, ancient or modern (other than *Sabo*, of course), which has attempted to delineate in definitive distances the minimum or maximum bounds of horizontal or vertical curtilage. Given the heightened significance of the ancient

concept of curtilage in modern Fourth Amendment jurisprudence, we will no doubt be called upon to apply that feudal concept in the strikingly non-feudal context of urban and suburban housing, as well as in cases such as the instant one involving the distinctly modern concept vertical privity. Difficult as the adaptation of the concept may be, I am not inclined to forego development via the case by case common law method in favor of the expedient alternative of adopting agency or statutory distances set for entirely separate purposes. If 14 C.F.R. § 91.79 were amended to alter the specified altitudes, would the constitutionally protected parameters of vertical curtilage be likewise altered *ipso facto?* Can state or federal legislators or administrators conclusively define curtilage for constitutional purposes? I think not.

Moreover, not all entries upon the curtilage of private property are unreasonable. *See Commonwealth v. McKiernan*, 337 Pa.Super. 403, 487 A.2d 7 (1985) (police officer's trespass on private land was reasonable in order to investigate possible shooting and to speak with particular person though to be present at the property and the evidence obtained while trespassing was therefore admissible, collecting cases); *Commonwealth v. Shannon*, 320 Pa.Super. 552, 467 A.2d 850 (1983) (police officer's entry into curtilage area was reasonable in response to a "flight in progress" radio report, the evidence obtained while trespassing was admissible); *Commonwealth v. Daniels*, 280 Pa.Super. 278, 421 A.2d 721 (1980) (police officer's approach to apartment, then "consensual" entry into apartment was reasonable in response to anonymous tip of an abduction in progress, the evidence obtained while trespassing was admissible); *Commonwealth v. Cubler*, 236 Pa.Super. 614, 346 A.2d 814 (1976) (police officer's entry in curtilage area was reasonable to retrieve black bag suspiciously discarded or hidden by suspect in a doghouse, the evidence obtained while trespassing was admissible); *accord People v. Houze*, 425 Mich. 82, 92 & n. 1, 387 N.W.2d 807, 811 & n. 1 (1986) (police officer's entry into curtilage area to look into a garage through a window was reasonable to investigate

anonymous tip concerning a stolen car, collecting cases); *Pistro v. State*, 590 P.2d 884, 886–87 (Alaska 1979) (police officer investigating an anonymous tip that a stolen truck was in a particular garage, who could not see into garage from street, reasonably walked up to driveway to look into the garage, and, therefore, was lawfully in a position to see the stolen truck in the garage when the garage door was opened); I *LaFave, Search & Seizure*, § 2.3 at 378–423 (2nd Ed.1987). Indeed, "the presence or absence of an accompanying trespass is merely a factor to consider in determining the reasonableness of a visual intrusion." *Commonwealth v. Soychak*, 221 Pa.Super. 458, 464, 289 A.2d 119, 122 (1972).

With respect to visual observations from helicopters, I am not willing to embrace *Sabo's* broad *per se* proscriptions. Rather, I would consider the totality of the circumstances, including the hour of day the observation occurs, the altitude at which the observations are made, the duration of the surveillance (including successive passes over the property); the distance between any residential structure and the helicopter, and the reason for and purpose of the surveillance, in determining whether the police were reasonably (lawfully) situated at the vantage point from which the observation were made. Here, review of those factors compels the conclusion that the encroachment was unreasonable.

Lamentably, it appears that the same observations could easily have been obtained lawfully. The initial tip regarding the marijuana came from an anonymous informant who was presumably the pilot of a fixed wing aircraft. In order to corroborate the tip, the police conducted the challenged helicopter surveillance. Inexplicably, the police attempted to make their observations with their naked eyes rather than with the lawful assistance of ordinary binoculars. *Cf. Commonwealth v. Williams*, 494 Pa. 496, 500, 431 A.2d 964, 966 (1981) (though observations through a "Startron" night scope were unreasonable under the circumstances, observations with ordinary binoculars were not); *Common-*

*wealth v. Hernley,* 216 Pa.Super. 177, 263 A.2d 904 (1970); *cert. denied* 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971) (observations through ordinary binoculars were reasonable); *see also* Nicholson, *Mechanically Aided Observations Under Fourth Amendment,* 11 Search and Seizure L.R. 1, 1–7 (1984). Had binoculars been used, the descent from public airspace into the vertical curtilage of appellant's private property would probably not have been necessary. This hindsight is not offered as a reproach to the police, I note this fact only to highlight the fact that our decision in this case need not unduly hamper reasonable narcotics enforcement efforts in future cases.*

* I note that I place no reliance whatsoever upon the majority opinion of the divided panel in *Commonwealth v. Lemanski,* 365 Pa.Super. 332, 529 A.2d 1085 (1987).