COMMONWEALTH of Pennsylvania,
Appellee

v.

Teri RHODES, Appellant.

Superior Court of Pennsylvania.

Argued Sept. 22, 2009.
Filed Dec. 31, 2009.

Philip B. Friedman, Erie, for appellant.

Elizabeth A. Hirz, Assistant District Attorney, Erie, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., ORIE MELVIN and BENDER, JJ.

OPINION BY BENDER, J.:

¶ 1 Teri Rhodes appeals the judgment of sentence imposed following her entry of an open plea of guilty to Voluntary Manslaughter, 18 Pa.C.S. § 2503(a), in the death of her infant daughter by neonaticide. Rhodes contends that the sentence imposed, of nine to eighteen years' incarceration, was manifestly excessive and the trial judge was motivated in imposing sentence by a pronounced bias that should have compelled him to recuse. Upon review, we concur in Rhodes's assessment. Because the record of these proceedings establishes that the trial judge acted substantially in derogation of the Pennsylvania Sentencing Code on the basis of evidence gathered *ex parte*, we conclude that the sentence imposed constitutes an abuse of discretion. We conclude further that the trial judge abused his discretion in refusing to grant Rhodes's request for recusal. Accordingly, we vacate the judgment of sentence and remand this matter for re-sentencing before another jurist.

¶ 2 This matter arises out of a tragic incident in which Teri Rhodes, an eighteen-year-old college student, gave birth to a full-term infant and, following labor, left her to die in a plastic bag. At the time of these events Rhodes was a sophomore at Mercyhurst College, a Catholic institution in the City of Erie, where she played as a member of the volleyball team. In August 2007, Rhodes returned to Mercyhurst from her home in Commerce Township, Michigan, to participate in varsity volleyball camp. On Friday, August 10, Rhodes underwent a team physical, during which the team doctor noted that she had a protu-

berant abdomen and had gained a substantial amount of weight. Although Rhodes denied that she was pregnant, the doctor suspected the contrary and ordered a sonogram for the following week.[1] In the interim, however, he cleared Rhodes to play volleyball. On Saturday, August 11, Rhodes completed two practices but at the conclusion of evening practice experienced severe abdominal cramping for which she took medication and went to bed early. On the following morning, Rhodes reported to practice but told her coaches that she was too ill to participate and excused herself to return to her apartment. Later that morning, she entered labor in her apartment bathroom and after several hours gave birth to a full-term baby girl delivered in the breech position. After the delivery, Rhodes placed the baby in a plastic bag and left her in the bathtub. Police later found the baby in that same location, dead. When Rhodes's assistant coach transported her to the hospital, Rhodes initially denied that she had been pregnant but ultimately acknowledged she had delivered a baby. An autopsy revealed that the baby's cause of death was asphyxiation.

¶ 3 Over a period of several days following Rhodes's delivery of the baby, Erie police conducted an investigation, interviewing her roommate and her coach and seizing her laptop computer for forensic examination. In a subsequent affidavit of probable cause, police alleged that Rhodes's roommate, Julia Butler, reported that she returned to the apartment at about 12:45 p.m. on the day in question and found Rhodes closed in the bathroom making noises suggestive that she was in

pain. Upon inquiry by Butler of whether she was alright, Rhodes asked that Butler go to the drugstore for her and buy some Midol. Butler did as requested and, upon returning, noted that Rhodes was still in the bathroom, where she could hear the shower running and Rhodes groaning. She then noticed spots of blood on the carpet in the bedroom and called assistant volleyball coach Sarah King for assistance. King arrived shortly thereafter and transported Rhodes to the hospital.

¶ 4 During her own interview with police, Coach King reported that when she arrived at Rhodes's apartment, she saw blood on the floor outside the bathroom. When she asked what was wrong, Rhodes responded that she was having a heavy menstrual bleed but did not suggest that she had delivered a baby. During another police interview, hospital personnel reported that after initially denying the delivery of her baby, Rhodes acknowledged that she had given birth but stated that the baby had died and that she had left it in a dumpster, although she could not recall where the dumpster was. In addition, Rhodes's roommate reported that she later discovered a message from Rhodes on her voicemail suggesting that she avoid going into the bathroom as "it [was] a mess." In the affidavit of probable cause executed for Rhodes's arrest, the police attested that forensic examination of the cache in Rhodes's laptop computer revealed that sometime prior to giving birth[2] she had conducted internet searches on pregnancy and means to provoke a miscarriage or otherwise abort a pregnancy.

---

1. The record does not reflect the precise day or date on which the sonogram was to take place. A police report, which the trial court filed with the certified record after entry of the judgment of sentence, indicates that "they were going to scheduled [sic] her for an ultra sound on Monday 8–13–07."

2. The affidavit of probable cause does not indicate the dates on which Rhodes conducted the searches.

¶ 5 On September 18, 2007, the Commonwealth charged Rhodes with Criminal Homicide, Concealing the Death of a Child, Endangering the Welfare of a Child, Reckless Endangerment, and Abuse of a Corpse, 18 Pa.C.S. § 2501(a), 4303(a), 4304(a), 2705, 5510 (respectively). Following negotiations with Rhodes's counsel, Philip B. Friedman, Esquire, the District Attorney of Erie County agreed to accept an open plea of guilty to Involuntary Manslaughter in exchange for dismissal of the remaining charges. Thereafter, however, the trial judge, the Honorable William R. Cunningham, rejected the plea and, when asked why, declined to elaborate.[3] Subsequently, defense counsel and the District Attorney renegotiated the proposed plea, agreeing that Rhodes would enter a plea to Voluntary Manslaughter. At the plea colloquy, convened on August 5, 2008, District Attorney Bradley Foulk[4] appeared on behalf of the Commonwealth and explained the terms of the plea agreement, the legal elements of the charge and the factual basis for the plea.[5] Mr. Foulk also explained that although the plea did not include a negotiated sentence, allowing the court to impose a sentence anywhere within the Guidelines ranges, he "[did] not believe that anyone here thinks that the aggravated range would apply." N.T., Plea Colloquy, 8/5/08, at 8. Mr. Foulk not-

ed further that, pending a favorable pre-sentence report, the Commonwealth would have no objection or would recommend that the court make a downward departure from the standard range.[6] Rhodes tendered her plea accordingly, following which Judge Cunningham clarified that "a judge can disregard or reject what the Commonwealth's position is and disregard or reject what your lawyer is saying on your behalf and impose whatever sentence the Judge thinks is appropriate[.]"[7] *Id.* at 22. Following Rhodes's confirmation of her understanding, Judge Cunningham reaffirmed with her that she was tendering her plea voluntarily, accepted her plea, and deferred sentencing pending the completion of the pre-sentence report.

¶ 6 At the subsequent sentencing proceeding, convened on October 27, 2008, Judge Cunningham acknowledged having received and reviewed some sixty-eight letters from Rhodes's family and friends as well as clergy, educators, counselors and charity leaders with whom Rhodes had studied or volunteered. N.T., Sentencing, 11/21/08, at 5. Every letter attested to Rhodes's character and good works and many pleaded that the court minimize Rhodes's jail time and see to her rehabilitation through community service. Sentencing Exhibits D1–D68. In support of

---

3. Rhodes asserts that Judge Cunningham had previously indicated that he would in fact accept a plea to Involuntary Manslaughter and then changed his position. However, Rhodes does not establish that the court's initial indication is documented of record.

4. Mr. Foulk is now deceased.

5. Foulk recited that "you Teri Rhodes intentionally caused the death of Teresa Rhodes, a newborn infant, while acting under a sudden and intense passion, resulting from serious provocation, and you killed her by intentionally placing Teresa Rhodes in a plastic bag, causing her death by asphysixiation [sic] or

suffocation." Rhodes accepted that recitation as the basis for her plea. Plea Colloquy, 8/5/08, at 14.

6. Based on Rhodes's prior record score of 0, a mitigated range sentence for Voluntary Manslaughter (Offense Gravity Score of 11) would be two to four years' incarceration.

7. The court's emphasis on its ability to reject the Commonwealth's sentencing recommendation prompted District Attorney Foulk to interject "[t]he Court can also accept the Commonwealth's recommendation as well, your Honor." N.T., Plea Colloquy, 8/5/08, at 22.

their requests, ten of those who had written, including Rhodes's parish priest, appeared at the sentencing hearing and testified on Rhodes's behalf. N.T., Sentencing, 11/21/08, at 9–22. Rhodes then exercised her right of allocution, following which District Attorney Foulk noted for the record that following receipt of the pre-sentence report, approximately two days before sentencing, the court had initiated contact with the District Attorney's Office to obtain copies of police reports compiled by the Erie Police Department and Erie County detectives. *Id.* at 23–24.

¶ 7 The Commonwealth then presented a nuanced position on sentencing, noting the absence of any comparable case in Erie County, and detailing the extent to which Rhodes and the circumstances of her crime fit the profile for neonaticide compiled by the Behavioral Science Unit of the FBI. D.A. Foulk then followed with an explanation of the profile as follows, highlighting the notable absence of motive and Rhodes's inexplicable denials in the face of certain discovery:

> [T]he profile for individuals that commit this type of crime are [sic] almost identical. They're almost solely within a particular age group that this defendant falls into. The crime is predominantly committed by middle—upper, middle or upper class women who are highly educated or in the process of being educated. Ninety-five percent of them, or higher, give the same scenarios, the same identical scenarios as we have in this particular case....

> All are full term pregnancies. Unlike most crimes, what made this case particularly difficult from a prosecution standpoint, is that when you ponder why an individual commits a crime, usually you have a motive. In this particular case, as in all neonaticide cases, it's hard to judge what the motive would be. Addi-

tionally, lacking motive, in this particular case you had a denial following the crime, and a continued denial through the process for quite a period of time. Yet what we found is there's no motive. And in this particular case there was absolutely no possibility of this crime going undetected. It was an eventual outcome that the baby's body would be discovered, which would lead to the contact of the authorities.

*Id.* at 26–27. Mr. Foulk then continued that prior to arriving at the plea, he researched the incidence and disposition of such cases nationally noting, "[a]s I said, there are very few, fortunately. But the cases that I was able to find, most of which were pleas, very seldom do these cases go to trial. As you know, some were pleas to involuntary manslaughter, some were pleas to voluntary manslaughter." *Id.* at 28–29. In lieu of a formal "recommendation," Mr. Foulk demurred noting that "the Commonwealth would take no position with regard to sentence ..." but then added that "if the Court saw fit to impose a sentence, mitigated, standard, Commonwealth would have no objection." *Id.* at 29.

¶ 8 Thereafter, commencing his own discussion of sentencing rationale, Judge Cunningham acknowledged the D.A.'s emphasis on the absence of any motive but then verified with him that motive is not an element of the crime to which Rhodes pled. *Id.* ("THE COURT: Well, you ask, Mr. Foulk, about why. I mean, you agree with me that motive is not an element of any crime."). The court then rejected the Commonwealth's application of the FBI's neonaticide profile and castigated D.A. Foulk at length for his exercise of prosecutorial discretion in recommending a sentence the court thought inconsistent with one imposed after a jury trial in another

case.[8] Mr. Foulk explained that the case to which the court referred was distinguishable on the basis that it was subject to a mandatory minimum sentence enhancement and had been prosecuted to verdict after the defendant turned down a plea offer that would have waived the enhancement. Nevertheless, the court remained resolute. The following exchange is illustrative of the court's concerns, which, as D.A. Foulk explained, were not relevant to the Commonwealth's sentencing recommendation for Teri Rhodes:

> THE COURT: I understand the Commonwealth's position in this case, but I'm not sure how it squares with your position in other cases.
>
> MR. FOULK: What?
>
> THE COURT: How it squares with your position in other cases. And not necessarily neonaticide, but, I mean, we have cases in Erie County that have been prosecuted with child abusers that haven't killed someone, that have a mandatory minimum, and they're doing at least five years in jail.
>
> MR. FOULK: Judge, if you're referring to a particular case, which I believe that you are—
>
> THE COURT: I'm about to.
>
> MR. FOULK: Okay. If you were referring to that particular case, the Commonwealth, if it's the case that I think it is—
>
> THE COURT: It's Chytoria Graham.
>
> MR. FOULK: Chytoria Graham.[9] The Chytoria Graham case I think can be very easily distinguished. The Commonwealth offered the defense a plea bargain in that case where the Commonwealth agreed to waive the mandatory five in exchange for a plea in the case. Chytoria Graham and her defense team rejected the plea with the waiver of [the] mandatory five, went to trial.
>
> I've heard about the Chytoria Graham case for months and months and months and months. It is easily distinguishable. That was a beating case in my opinion, and it was a waiver of the mandatory five. She chose to go to trial. She was convicted and it placed the Commonwealth in a position where we couldn't do anything about the mandatory five.
>
> THE COURT: Well, after the trial and before sentencing you could still waive it. You're not compelled to seek it.
>
> MR. FOULK: I understand that. But you can't have—you can't reject a plea bargain, go to trial and then come back to the Commonwealth and ask the Commonwealth to waive a mandatory minimum. That would put me in an untenable position.
>
> THE COURT: I understand that. But, my point is, you still have discretion up until the time of sentencing to waive it.
>
> MR. FOULK: Correct.
>
> THE COURT: I understand why you didn't, but I think there needs to be some explanation of it—

*Id.* at 33.[10]

¶ 9 Following a defense by Mr. Foulk of his record in prosecuting crimes against

---

8. As Mr. Foulk recognized, prior to his own election in 2000, Judge Cunningham served for two terms as District Attorney of Erie County.

9. In the Chytoria Graham case, Defendant Graham was convicted of aggravated assault after she used her baby, then several months old, as a projectile, throwing the infant at her paramour during a drunken quarrel. The baby was seriously injured.

10. We find D.A. Foulk's explanation of the Commonwealth's decision to seek a mandatory minimum sentence in the Graham case facially reasonable. Nevertheless, before ever hearing that explanation, Judge Cunningham had recorded in his Statement of Sentencing

children, the record reflects for the first time the trial court's distribution of its written Statement of Sentencing Rationale. *Id.* at 34. Although both counsel had only then received the document, according to Rhodes's brief the court had passed it to those assembled in the courtroom, including members of the media, before the sentencing hearing had even commenced. Brief for Appellant at 48 ("Prior to the commencement of the hearing and unbeknownst to counsel, the court, through its staff, distributed a 36 page document entitled 'Statement of Sentencing Rationale' to members of the media and to members of the public seated in the courtroom.... Neither the district attorney nor defense counsel were provided with a copy of the document nor even advised of its existence. At the end of counsel's presentations the court's staff handed a copy of the document to counsel."). Rhodes's counsel objected to the dissemination of the document and requested an opportunity to read it and to confer with the court in chambers. N.T., Sentencing, 11/21/08, at 34. Judge Cunningham declined to recess the proceedings and continued with an extended discussion on the record largely duplicative of what appeared in the document. Significantly, the court drew far-reaching factual inferences concerning both Rhodes's motive and conduct from police reports filed with the Erie Bureau of Police, which were not then of record. Judge Cunningham had obtained those reports

from the District Attorney's Office, apparently without the knowledge of defense counsel, who then was afforded no opportunity to examine the officers who compiled the reports or the witnesses from whose interviews the reports were composed. Brief for Appellant at 11 ("Unbeknownst to defendant's counsel, Judge Cunningham obtained copies of police reports and other documents several days prior to the sentence hearing."); N.T., Sentencing, 11/21/08, at 23 ("MR FOULK: ... As the Court will recall, you requested that the Commonwealth provide you with copies of all the Erie Police Department police reports"). The court made no reference, however, to the pre-sentence investigation it had ordered or the resulting report.[11] In that report, following a meeting with and evaluation of Rhodes, Probation Officer Jayne M. McNally, described the defendant as "still, in almost every aspect a child[,]" and recommended that, regardless of the sentence imposed, she receive ongoing treatment by a psychologist or psychiatrist. Pre–Sentence Investigation Report, 8/5/08, at 4 (unnumbered). The report also included a written assessment by Cathy J. Pietrofesa, Ph.D., Rhodes's treating psychologist, which substantiated Officer McNally's conclusion.

¶ 10 Although the court purported to accept as the basis for Rhodes's plea her acknowledgment of the "sudden and intense passion" and "serious provocation" inherent in Voluntary Manslaughter,[12] it in

---

Rationale that, based on the Graham case, "the Commonwealth's sentencing position in this [Rhodes] case does not carry any weight." Statement of Sentencing Rationale, 11/21/08, at 34. The court's stated rational is limited to the assertion that "[t]he gravity of the criminal conduct of Teri Rhodes is greater than [that of] Chytoria Graham." *Id.* The court's statement thus recognizes no distinction between the procedural contexts of the two prosecutions and appears to usurp prose-

cutorial discretion in arriving at a plea bargain.

11. Ultimately, in an opinion filed with its order denying Rhodes's post-sentence motion, the court dismissed the pre-sentence report as "meager," noting that it "provided little insight into the circumstances surrounding this crime." Trial Court Opinion, 1/26/09, at 41.

12. The Pennsylvania Crimes Code defines Voluntary Manslaughter as follows:

fact rejected those same elements for the purpose of imposing sentence. The following excerpt is illustrative:

> I recognize that accepting the testimony of Dr. Sadoff, perhaps Dr. Kaye, Dr. . . . Pietrofesa, the therapist, that it is possible, if the jury found their testimony credible, along with any other evidence presented by the defendant, that it could be determined that this killing occurred as part of a sudden passion and serious provocation.
>
> Now I accept that proffer for purposes of the plea and allowing the plea. Part of the determination that's made in this case is— or made for purposes of a plea is whether there's sufficient evidence for a jury to find serious provocation for purposes of a plea. It doesn't mean that a judge or a court would find that, but that the defendant would have a right to present that to a jury if there's sufficient evidence. So I make that distinction that, yes, there is sufficient testimony that if that testimony and evidence is found to be credible, it would allow the entry of a plea. But that does not mean that those facts are binding for sentencing purposes. And I note that because when I read the police reports and saw the chronology of what occurred in this case I have to say that had I been sitting as a juror in this case, I could not have found there was serious provocation, and I want to explain in detail why, and I want to explain why I do not find there's mitigation in this killing.

§ 2503. Voluntary manslaughter
(a) **General rule.**—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
(1) the individual killed; or
(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

N.T., Sentencing, 11/21/08, at 37–38. The court then proceeded with an alternate recitation of the case, drawing unfavorable inferences against the defendant and fashioning a narrative of depravity and deceit indicative of a "premeditated, calculated and intentional killing." N.T., Sentencing, 11/21/08, at 38, 39, 50, 63. *See also id.* at 44 ("There were circumstances where you obviously knew you were pregnant. And when you go on the Internet and research ways to kill your fetus, or kill a fetus, in different methods, this is the beginning of your intent to kill this fetus."). The court also dismissed the conclusion of the psychological evaluations that Rhodes was dissociated from reality, *id.* at 44, to reach the conclusion that the defendant had not only plotted the demise of her baby but seemingly had induced her own labor so as to kill her infant before ultrasound imaging disclosed her pregnancy:

> What is apparent to me is that on Friday, when you learned that there was going to be an ultrasound test on Monday, you knew that your secret couldn't survive. That you have, up to Friday, anybody that questioned you about your pregnancy you could deny it and there's no way they could confirm their suspicion one way or another. But you knew that you couldn't lie to the ultrasound test and you knew that come Monday,[13] it would be discovered. You also knew, based on your research on the Internet, ways to kill a fetus, ways to terminate a

18 Pa.C.S.A. § 2503.

13. The court's conclusion that the ultrasound imaging was scheduled for Monday, August 13, appears to come from a police report that, in turn, related the recollection of team trainer Bryan Bentz. Neither Mr. Bentz nor the officer who compiled the police report appeared at the sentencing hearing.

pregnancy, and all the different sites that you had gone and researched. And at some point during this weekend you made an intentional, deliberate decision to kill this child.

*Id.* at 61. Characterizing these apparent fact findings as a recitation of aggravating factors, the court then concluded the hearing with a nod to the Sentencing Guidelines, but imposed a sentence of ten to twenty years' imprisonment, only one to two years shy of the statutory maximum for Voluntary Manslaughter.[14]

¶ 11 At the conclusion of the hearing, defense counsel rose to record his objections but the judge declined to proceed further, closing the record at 11:05 a.m. and leaving the bench. When the court returned seven minutes later, it did so in closed session, all spectators and members of the media having been cleared from the courtroom. Defense counsel was then permitted to enter his objections of record, which he did, arguing strenuously that his client had suffered prejudice of constitutional proportions as a result of the trial court's extreme approach to sentencing:

> MR. FRIEDMAN: Your Honor, for the record, the record should indicate that the Court, following the remarks of the defense and Commonwealth, provided us with a Statement of Sentencing Rationale.
>
> THE COURT: Right.
>
> Mr. Friedman: Thirty-six pages in length.
>
> * * *
>
> Your Honor, the Court then went through a long recitation of the Court's view of [the] facts of this case. Has the Court, in fact, held hearings and heard these witnesses testify?
>
> THE COURT: I don't think I need to.
>
> MR. FRIEDMAN: Your Honor, I object to this procedure. This is a star chamber procedure. The Court has gone through and made all kinds of factual findings and conclusions based upon things that I don't even know that I've ever seen, and then—and then—
>
> THE COURT: This information was available to you and to me.
>
> MR. FRIEDMAN: I don't know but the Court made conclusions from facts that are not of record. The Court has turned itself, in my view, into the prosecutor in this case. The Court has not provided me with this information, given me a chance to cross-examine any of these people.

---

14. In his Statement of Sentencing Rationale, Judge Cunningham seemingly drew further inferences concerning Rhodes's motivation, treating her behavior as a manifestation of personal inconvenience. The court's rationale also enunciates a philosophy of indiscriminate sentencing based principally on the fact of a child's involvement as the victim and appears to include Rhodes's case in that larger class of cases. The court stated as follows:

   Unfortunately, too many young people are bringing children into this world without any sense of parental responsibilities. In Erie County there has been an alarming number of horrific cases in which young parents have killed and/or seriously abused an infant child. The reason for such immoral behavior varies. A hardened cynic may observe we have become a society of disposable babies.

   Can it become acceptable to kill a newborn child who might otherwise interfere with the parent's future? Can we allow babies to be seriously harmed or killed because they are an inconvenience or frustration to the parents? The only true answer to these questions is for our society to say that any killing of a child warrants serious consequences. This response has to be consistent, regardless of whether the victim is seconds, minutes, days or years old. To hold otherwise creates an open season on all infant children in our community.

   Statement of Sentence Rationale, 11/21/08, at 30.

THE COURT: There were police reports.

MR. FRIEDMAN: Could I finish?

THE COURT: The police reports you had access to read.

MR. FRIEDMAN: The Court goes on to say it was a premeditated, calculated and intentional killing. That's what the Court says in here.

THE COURT: That's correct.

MR. FRIEDMAN: The Court concludes, based upon a review of evidence not of record, not subject to cross-examination that this is a first degree murder case and then the Court imposes a sentence totally rejecting the plea that was done in this case to voluntary manslaughter. I think the Court has abused its discretion. I would ask—I would ask you to recuse yourself in this case. I've asked before. Originally, as the Court will recall, we had an agreement that we ran past the Court, this was going to be a plea to involuntary manslaughter. The Court at that time indicated that based upon information that it had obtained that we were not aware of, that it would not accept the plea. The Court then indicated—

THE COURT: No, I indicated to you this was an intentional killing, this wasn't grossly negligent or reckless for purposes of involuntary.

MR. FRIEDMAN: You told us specifically you will not—on the day of the plea you called us in and said I will not accept the plea to involuntary. We, therefore, agreed to enter a plea to voluntary manslaughter which the Court accepted. And today, not only did the Court go into [sic] beyond the aggravated range times two, but it does so based upon a proceeding that was totally unfair. We had a sentencing hearing today that was a complete nullity. We brought these people in and it made—they didn't need to be here. There was a violation of the Sentencing Code but [sic] not even having a hearing, the sentence was predetermined, but based upon evidence not of record.

THE COURT: Are you done, because if you want to take an appeal, go ahead, Mr. Friedman.

MR. FRIEDMAN: I have to put it on the record.

THE COURT: You can file a motion. Good luck.

MR. FRIEDMAN: I ask for bail pending appeal.

THE COURT: File a motion.

N.T., Sentencing Objections, 11/21/08, at 2–5.

¶ 12 Following sentencing, on December 1, 2008, Rhodes filed a motion for post sentence relief requesting that Judge Cunningham vacate the judgment of sentence and recuse himself from further consideration of her case. On January 20, 2009, Rhodes supplemented the motion with a submission amplifying the motion to recuse based upon the court's refusal to entertain a post-trial request for bail due to a typographical error in the body of the application, which cited Pa.R.Crim.P. 520(B) ("Bail Before Verdict") rather than Pa.R.Crim.P. 521(B) ("Bail After Finding of Guilt").[15] In that supplemental filing, Rhodes averred that "the application for bail clearly indicates that the application was being filed pursuant to Pa.R.Crim.P. 521(B)[,]" and accused Judge Cunningham of having willfully refused to consider the

---

**15.** Although the Application for Bail cited Rule 520(B) in the precatory language of its opening paragraph (line 3), the body of the application cited Rule 521(B)(2), (3), and as-serted that "Pennsylvania Rule 521 provides for bail after sentencing while a post-sentence motion is pending." Application for Bail, filed 12/22/08, at 1.

merits of the bail application: "It is respectfully averred that the court knew full well that the motion was being filed for bail following sentence pursuant to Rule 521. Ms. Rhodes had obviously been sentenced and the bail application, although containing a typographical error, clearly was for bail post sentencing." Supplement to Post Sentence Motion, 1/20/09, at 1–2. Six days after Rhodes filed the Supplement, the court denied her post sentence motion by order of January 26, 2009, and filed with it a sixty-page opinion repeating and amplifying the findings and conclusions the court had reached before the sentencing hearing and then recited on the record at the hearing. Trial Court Opinion and Order, 1/26/09. In the order, Judge Cunningham responded specifically to Rhodes's motion for recusal as follows:

> Defense Counsel has also requested recusal pursuant to Cannon III(c) of the Code of Judicial Conduct. As Defense Counsel is aware, this Court is not related to any of the parties involved in this case. This Court does not know the Defendant and/or her family and/or any witnesses tendered in this case. Further, this Court is not a witness to any of the events nor has this Court ever served as a lawyer in any matter affecting the parties. This Court has no financial or fiduciary interest in this case.

*Id.* at 61.

¶ 13 On January 27, 2009, Rhodes's counsel filed a Notice of Appeal to this Court. Subsequently, counsel filed an additional motion to recuse asserting that Judge Cunningham's interaction with members of the media surrounding sentencing created an appearance of impropriety that should compel his recusal. Rhodes's "Motion to Recuse (Second Request)" averred in pertinent part as follows:

> 4. Immediately upon filing the court's opinion, the court, upon information and belief, contacted electronic and print media in Erie County. The court even went so far as to suggest that WJET–TV post the court's opinion on its web site. A copy of the email from the court to WJET is attached hereto and marked as Exhibit "A."
>
> 5. The defendant respectfully avers that the court's actions in this case require recusal. The court has not acted in an impartial fashion and continued involvement creates an appearance of impropriety. The court has repeatedly used this case to generate publicity. Prior to the sentencing hearing the court communicated by e-mail with a reporter from the Erie Times News in which the court indicated that it would "have a lot to say about this case including prosecutorial discretion in the appropriate legal forum." At the time of the sentencing hearing the court made good on its promise to the Erie Times News by contrasting this case with other cases which had been prosecuted in Erie County but which were completely unrelated to the current case. In addition, the court prepared in advance of the sentencing hearing a 36 page hearing document entitled "Statement of Sentencing Rationale." In advance of the sentencing hearing, the court made approximately 75 copies of the document which were, upon information and belief, copied at taxpayers' expense. At time of sentencing hearing [sic] the court's staff provided all the spectators in the courtroom and representatives of the media with copies of the document.

Motion to Recuse (Second Request), 2/17/09, at 1–2. Judge Cunningham denied this motion and on March 31, 2009, filed an opinion pursuant to Pa.R.A.P. 1925(a), responding to counsel's assertions of impropriety in his communication with

members of the media, noting specifically that his remarks to the Erie Times News had been made in response to a request for information from a reporter.[16] The court then averred that "[t]he timing and content of defense counsel's requests for recusal suggest the real motive: a readily transparent attempt to judge-shop." Trial Court Rule 1925(a) Opinion, 3/31/09, at 6. The court went on to note its dismay stating "[i]t is surprising these attacks come from a lawyer charged with ethical responsibilities under the Rules of Professional Conduct and our Code of Civility." Trial Court Rule 1925(a) Opinion, 3/31/09, at 6 (footnote omitted).

¶ 14 In this appeal, Rhodes challenges the judgment of sentence the court imposed as well as Judge Cunningham's refusal to recuse himself from participation in the case in response to the multiple requests Rhodes's counsel made. Rhodes's Statement of the Questions Involved appears as follows:

I.  Whether the court relied upon improper considerations in the imposition of sentence.

    A.  Intentional premeditated killing

    B.  Matters not of record

    C.  Racial considerations/Chytoria Graham case

    D.  Morality

II.  Whether the lower court abused its discretion in the imposition of sentence.

    A.  Whether the sentence exceeded the Sentencing Guidelines and was unreasonable[.]

B.  Whether the sentence imposed was manifestly excessive.

C.  Whether the sentencing court abused its discretion by imposing sentence based exclusively upon the seriousness of the crime and giving no consideration to the Defendant's personal history, rehabilitative needs or background.

III.  Whether the Due Process clauses of the United States and Pennsylvania Constitutions are violated when a defendant enters a guilty plea to Voluntary Manslaughter but the court, after conducting an *in camera* investigation, concludes that the defendant committed first degree murder and enhances the sentence based upon the *in camera* proceedings.

IV.  Whether the lower court abused its discretion in refusing to recuse.

Brief for Appellant at 4–5.[17]

▮▮▮▮ ¶ 15 As a preliminary matter, we note that Rhodes's questions I, II, and III challenge discretionary aspects of the process of sentencing as applied by the trial court. Accordingly, Rhodes is not entitled to review of those questions as of right, *see Commonwealth v. Fiascki*, 886 A.2d 261, 263 (Pa.Super.2005); we consider them in the first instance only as requests for allowance of appeal subject to the requirements of Pa.R.A.P. 2119(f) and the body of case law that interprets and applies it. *See Commonwealth v. Hoch*, 936 A.2d 515, 518 (Pa.Super.2007). Rule 2119(f) requires

---

**16.** The reporter's request, in the form of an e-mail, contrasted Rhodes's case with that of one Rodger O. Henry who had killed a 4–month old baby in 2001 and attempted to plead guilty to Voluntary Manslaughter but whose plea was rejected by another Erie County judge. The reporter observed "I'm unclear on how the Teri Rhodes plea fits the definition of voluntary manslaughter[,]" and noted that Henry ultimately pled guilty to

third-degree murder and was sentenced to 15 to 35 years' in prison. Trial Court Rule 1925(a) Opinion, 3/31/09, at 2–3 (quoting E-mail dated 8/6/08)).

**17.** The Commonwealth did not submit an advocate's brief in this case but instead incorporated by reference the trial court's opinions of January 26, 2009 and March 31, 2009.

that Rhodes, as the appellant, include in her brief a Concise Statement of Reasons Relied Upon for Allowance of Appeal which, in turn, must raise a "substantial question" as to whether the trial judge, in imposing sentence, violated a provision of the Sentencing Code or contravened a "fundamental norm" of the sentencing process. *See Fiascki*, 886 A.2d at 263; *Commonwealth v. Ousley*, 392 Pa.Super. 549, 573 A.2d 599, 601 (1990). The determination of whether a particular issue poses a substantial question is to be made on a case-by-case basis. *See Fiascki*, 886 A.2d at 263.

■ ¶ 16 In this case, Rhodes has satisfied the threshold requirements for review of the discretionary aspects of the sentence imposed, having included a thorough Rule 2119(f) Statement. That statement poses substantial questions concerning Judge Cunningham's imposition of sentence based solely on the seriousness of the offense without considering all relevant factors, *see Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa.Super.2009); his reliance upon impermissible considerations, *see id., see also Commonwealth v. Crork*, 966 A.2d 585, 590 (Pa.Super.2009), including unsubstantiated hearsay, *see Commonwealth v. Cruz*, 265 Pa.Super. 474, 402 A.2d 536 (1979); his imposition of an excessive sentence beyond the ranges of the Sentencing Guidelines based on impermissible considerations, *see id., see also Commonwealth v. Kraft*, 737 A.2d 755, 757 (Pa.Super.1999), *Commonwealth v. Guth*, 735 A.2d 709, 711 (Pa.Super.1999); his reliance on crimes and conduct not charged, *see Commonwealth v. Chase*, 365 Pa.Super. 572, 530 A.2d 458, 462 (1987), *Commonwealth v. Stufflet*, 322 Pa.Super. 176, 469 A.2d 240, 243 (1983), and his reliance on matters outside the record such as police reports, *see Commonwealth v. Schwartz*, 275

Pa.Super. 112, 418 A.2d 637, 638, 640–41 (1980).

■ ¶ 17 Following careful scrutiny of the record as well as the trial court's written submissions, we find ample ground for vacating the judgment of sentence based on Rhodes's challenges to the court's reliance on impermissible considerations. *See id.* ("[I]t is not necessary that an appellate court be convinced that the trial judge in fact relied upon an erroneous consideration; it is sufficient to render a sentence invalid if it reasonably appears from the record that the trial court relied in whole or in part upon such a factor."). The court's reliance on police reports it obtained *ex parte* is of particular concern, as Judge Cunningham failed to afford Rhodes the opportunity to cross-examine the witnesses whose hearsay statements comprised the bulk of the reports' contents. He then drew factual inferences directly from those reports on the basis of which he imposed a sentence almost five times that recommended by the Commonwealth and only one to two years shy of the statutory maximum for Voluntary Manslaughter. The court then sought to buttress the sentence with the repeated assertion that its duration reflected Rhodes's commission of a "calculated, premeditated killing," reflecting a finding of elements that define an offense with which Rhodes was not charged and to which she did not plead. Every such occurrence contravened accepted sentencing "norms" in this Commonwealth. *See id.* ("Other jurisdictions have similarly recognized the impropriety of a judge sentencing on out-of-court information, communication and investigation ... and this [C]ourt has previously noted that reliance on unverified hearsay outside the record is impermissible."); *Commonwealth. v. Sypin*, 341 Pa.Super. 506, 491 A.2d 1371, 1372 (1985) (reaffirming holdings of *Commonwealth v.*

*Karash*, 306 Pa.Super. 229, 452 A.2d 528, 528 (1982), and *Stufflet, supra,* that trial court may not impose sentence on the basis of offense or conduct not charged or pled).

¶ 18 In so stating, we acknowledge that prior to imposing sentence "[a] sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *Schwartz,* 418 A.2d 637, 640–641 (quoting *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972)).

> Nevertheless, the discretion of a sentencing judge is not unfettered; a defendant has the right to minimal safeguards to ensure that the sentencing court does not rely on factually erroneous information, and any sentence predicated on such false assumptions is inimicable [sic] to the concept of due process. *United States v. Tucker, supra; Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). Obviously, the probability of receiving accurate

> pre-sentence information is considerably enhanced when the defendant has an opportunity to review and dispute the facts and allegations available to the sentencing judge.

*Id.* See also *Karash,* 452 A.2d at 528 (citations omitted) ("[T]he court violates the defendant's right to due process if, in deciding upon the sentence, it considers unreliable information or information affecting the court's impartiality, or information that it is otherwise unfair to hold against the defendant.").[18]

¶ 19 Despite the trial court's assertions here that defense counsel had equal access to the police reports on which the court relied at sentencing, the fact remains that the court made use of those reports without advance disclosure and in place of the pre-sentence report on which the defense quite reasonably relied.[19] We find the court's undisclosed use of these documents a source of substantial prejudice. Our Sentencing Code sanctions the use of pre-sentence reports based upon the investigation of a probation officer who, unlike the Commonwealth and the prosecuting police

**18.** The court's several opinions attempt to buttress its consideration of matters outside the record by reference to our en banc decision in *Commonwealth v. Goggins. See, e.g.,* Rule 1925(a) Opinion, 3/31/09, at 13 (quoting *Goggins,* 748 A.2d 721, 728 (Pa.Super.2000) (noting that it is "part of the responsibility of a sentencing judge to 'conduct sufficient presentence inquiry such that, at a minimum, the court is apprised of the particular circumstances of the offense, *not limited to those of record,* as well as the defendant's personal history and background.'")) (emphasis in trial court opinion). The court's reliance is misplaced. We reached our decision in *Goggins* on the basis of a trial judge's decision to confine a defendant to prison without ordering a pre-sentence investigation, questioning the defendant concerning his personal background, or otherwise informing himself of the sentencing factors the Rules of Court require a sentencing judge to consider. *See Goggins,* 748 A.2d at 728. To that end, our decision

recognizes our current pre-sentence investigation process as the preferred method by which a trial judge should apprise himself of the appropriate information at sentencing. *See id.* (quoting *Commonwealth v. Martin,* 466 Pa. 118, 351 A.2d 650, 657 (1976) (quoting ABA PROJECT ON MINIMUM STANDARDS OF JUSTICE, STANDARDS RELATING TO PROBATION § 2.3 (Approved Draft, 1970)). In no way did our decision license the manner of *ex parte* investigation the court conducted in this case where, we note, a pre-sentence report had been compiled. Nor did it abrogate the disclosure requirement in *Schwartz, supra.*

**19.** As we have discussed, *supra,* disclosure of the trial court's *ex parte* contact was ultimately made by the District Attorney after the court had already composed and disseminated its Statement of Sentencing Rationale.

officers who compile police reports, is a "professional neutral." *See Schwartz,* 418 A.2d at 642. As a prophylactic measure, the resulting pre-sentence investigation report must then be disclosed to allow the defendant and her counsel the opportunity to challenge the information it contains. *See id.* ("The prophylactic measure of pre-sentence report disclosure would be seriously compromised if the sentencing judge was permitted to surreptitiously gather information outside the report without affording the defendant the opportunity to verify its accuracy."). If a pre-sentence report prepared by a "professional neutral" must be disclosed, "then *a fortiori* the information proffered by the prosecuting officials need be disclosed and examined." *Id.*

¶ 20 Regrettably, the trial court's reliance on the undisclosed and unchallenged hearsay of the police reports allowed it to reach the tendentious characterization of Rhodes's conduct on which it based its rejection of the FBI neonaticide profile and the Commonwealth's sentence recommendation. Although a court is never compelled to accept the Commonwealth's recommendation of sentence on an open plea, the bases upon which Judge Cunningham did so cannot be sustained on the record before us. Rhodes was not charged with premeditated killing, *i.e.,* murder in the first degree, and did not accept pre-

meditation as part of the factual basis of her plea. Nevertheless, the court consciously relied on that element at sentencing, emphasizing repeatedly that Rhodes's crime was a "premeditated, calculated and intentional killing." N.T., Sentencing, 11/21/08, at 38, 39, 50, 63. In so doing, the court effectively convicted and sentenced the defendant for conduct and intent she had not admitted and could not prepare to address. Rhodes's crime was Voluntary Manslaughter as defined by 18 Pa.C.S. § 2503(a); she was presumptively innocent of first degree murder.[20] Of course, we cannot know whether the court was motivated in its determination merely by its view of the facts, or by other factors such as its personal philosophy on sentencing or its disapproval of the Commonwealth's exercise of prosecutorial discretion. Regardless, the court's own exercise of discretion in the imposition of sentence was inappropriate, unjustified, and prejudicial.

¶ 21 In response to the process the court employed at sentencing, Rhodes's counsel made multiple requests for Judge Cunningham's recusal from further consideration of this case. The court having denied each one of them, Rhodes asserts in her fourth question on appeal that the court conducted the proceedings before, during, and after sentencing in a manner suggesting at least the appearance

---

**20.** Judge Cunningham's Supplement to Rule 1925(a) Opinion, filed on May 4, 2009, would appear to substantiate our concern that the court deemed it appropriate to impose sentence on the basis of conduct and intent neither charged nor pled. In that supplemental opinion, Judge Cunningham directs our attention to the case of Lauren Elizabeth Jones who killed her newborn infant under circumstances similar to those at issue here. The opinion notes that Jones, who was prosecuted in Butler County, pled *nolo contendere* to Murder in the Third Degree, Concealing Death of a Child Born Out of Wedlock, and Abuse of a Corpse, and observes that the trial

court imposed an aggregate sentence of eight years' to twenty years' imprisonment. The Jones case is, of course, distinguishable. Regardless of any similarity of the facts in the two cases, the determining factor remains the level of culpability imposed by the plea the respective defendants accepted. Unlike Jones, Rhodes did not enter a plea to murder of any degree. Any determination to sentence her as if she had is a clear violation of due process and an abuse of the trial court's sentencing discretion. *See Karash,* 452 A.2d at 529; *Schwartz,* 418 A.2d at 638–39 (citing *Commonwealth v. Bethea,* 474 Pa. 571, 379 A.2d 102, 106–07 (1977)).

of bias. Brief for Appellant at 46. Accordingly, Rhodes requests that we vacate the judgment of sentence and remand the matter for re-sentencing before another judge. *See id.* In its Rule 1925(a) Opinion, the trial court responds to Rhodes's assertion of the need for recusal only to the extent that Rhodes asserted the impropriety of the court's contact with a reporter the Erie Times News and the court's efforts to publish its Statement of Sentencing Rationale through various media outlets, on Erie County's website and in the Erie County Legal Journal. The Opinion does not indicate the extent of Judge Cunningham's reflection on his ability to proceed impartially; nor does it analyze whether the court's conduct at sentencing might give rise to the appearance of bias. We find the potential for such an appearance significant and therefore dispositive of this appeal.

> "The sentencing decision is of paramount importance in our criminal justice system," and must be adjudicated by a fair and unbiased judge. *Commonwealth v. Knighton,* 490 Pa. 16, 21, 415 A.2d 9 (1980). This means, a jurist who "assess[es] the case in an impartial manner, free of personal bias or interest in the outcome." *Commonwealth v. Abu-Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998). Because of the tremendous discretion a judge has when sentencing, "a defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned." *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727, 732 (1983). "A tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings." *In Interest of McFall,* 533 Pa. 24, 617 A.2d 707, 714 (1992)

*Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104, 108 (2004).

¶ 22 Our Supreme Court presumes that judges of this Commonwealth are "honorable, fair and competent[,]" and vests in each jurist the duty to determine, in the first instance, whether he or she can preside impartially. *Id.* (citing *Commonwealth v. White,* 557 Pa. 408, 734 A.2d 374, 384 (1999)). In the context of criminal sentencing, however, this standard requires that the judge recuse himself not only when he doubts his own ability to preside impartially, but whenever he "believes his impartiality can be reasonably questioned." *Commonwealth v. Lemanski,* 365 Pa.Super. 332, 529 A.2d 1085, 1088–1089 (1987) (quoting *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652, 654 (1973)). *See also Abu–Jamal,* 720 A.2d at 89; *Commonwealth v. Benchoff,* 700 A.2d 1289, 1294–1295 (Pa.Super.1997) (citing *In the Interest of McFall,* 617 A.2d at 712) ("Because the integrity of the judiciary is compromised by the appearance of impropriety, recusal is necessary where the judge's behavior *appears* to be biased or prejudicial."). Consequently, "a party arguing for recusal need not prove that the judge's rulings actually prejudiced him; it is enough to prove that the reasonable observer might question the judge's impartiality." *Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth.,* 330 Pa.Super. 420, 479 A.2d 973, 991–993 (1984). *See also Lemanski,* 529 A.2d at 1088 ("We share in the Supreme Court's awareness that the appearance of bias or prejudice can be as damaging to public confidence in the administration of justice as would be the actual presence of these elements.") (internal citations omitted). Similarly, a party's call for recusal need not be based only upon discreet incidents, but may also assert the cumulative effect of a judge's remarks and conduct even though no single act creates an appearance of bias or

impropriety. *See Benchoff,* 700 A.2d at 1295.

¶ 23 Our review of a trial court's decision denying a motion to recuse is limited to abuse of discretion. *See id.* Where the claim at issue arises from imposition of a criminal sentence, we may find such an abuse when objective scrutiny of the record casts doubt on the judge's impartiality, *see Darush,* 459 A.2d at 732, or "where the judge's behavior *appears* to be biased or prejudicial[,]" *see Benchoff,* 700 A.2d at 1294–1295 (citing *In the Interest of McFall,* 617 A.2d at 712). Indeed, our Supreme Court has recognized that even upon confirmation that a sentencing judge did not give effect to his personal bias, the extraordinary discretion he is empowered to exercise may compel his removal from the case if his impartiality can be reasonably questioned. *See also Darush,* 459 A.2d at 732 ("[C]onsidering all the circumstances, especially the trial court's inability to affirmatively admit or deny making remarks from which a significant minority of the lay community could reasonably question the court's impartiality, we feel the largely unfettered sentencing discretion afforded a judge is better exercised by one without hint of animosity toward appellant."). Thus, the determinative factor in sentencing cases remains the integrity of the process and the necessity that the judge's impartiality "cannot reasonably be questioned." *Id.*

¶ 24 To that end, a judge's removal may be compelled where his remarks reflect prejudgment of the case as one of a particular class of cases or where his reliance at sentencing on conduct or offenses not charged raises a reasonable question about his impartiality. *See Lemanski,* 529 A.2d at 1088 ("A party is not limited to his own case in establishing personal bias, and may show temperamental prejudice on the particular class of litigation involved to support his allegations.") (citation omitted); *Commonwealth v. Sypin,* 341 Pa.Super. 506, 491 A.2d 1371, 1374 (1985) (vacating judgment of sentence and remanding for resentencing before another judge on the basis of perceived bias where judge, when imposing sentence, referenced disappearance and death of children although defendant had not been charged with kidnapping or killing children); *Commonwealth v. Bryant,* 328 Pa.Super. 1, 476 A.2d 422 (1984) (remanding case for resentencing before a different judge where sentencing judge's *in camera* remarks in a prior case showed his predetermination to impose maximum sentence and defendant filed a motion for recusal).[21]

¶ 25 In this case, the record offers ample basis upon which to question the trial court's impartiality. Notably, the court responded to Rhodes's allegations of bias without a discussion of the subjective reflection our law requires of every judge whose impartiality is questioned. *See Druce,* 848 A.2d at 108 ("If a party questions the impartiality of a judge, the proper recourse is a motion for recusal, requesting that the judge make an independent, self-analysis of the ability to be impartial. If content with that inner examination, the judge must then decide 'whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary.'") (cita-

---

**21.** Contrary to the trial court's assertion, *see* Rule 1925(a) Opinion, 3/31/09, at 34, this Court does, under limited circumstances, retain the authority to direct resentencing before another judge. Although our Supreme Court limited our authority to replace a trial judge *sua sponte, see Commonwealth v. Whitmore,* 590 Pa. 376, 912 A.2d 827, 834 (2006), it did not purport to do so where the aggrieved party filed a motion to recuse and the record establishes that the trial judge abused his discretion in denying it.

tion omitted). Instead, the court sought to justify its decision not to recuse by denying any external affiliation or relationship that would demonstrate bias and then castigated defense counsel for seeking the court's recusal. *See* Rule 1925(a) Opinion, 3/31/09, at 7; Trial Court Opinion and Order, 1/26/09, at 61. Such an examination is not sufficient to satisfy the direction of applicable case law and may, in its tone and apparent insufficiency, reinforce doubts otherwise raised by the record concerning the appearance of bias. *See Darush,* 459 A.2d at 732.

¶ 26 Regrettably, the record, which we have examined in exhaustive detail, raises significant concerns that the trial court may have prejudged this case or reached its decision at sentencing on the basis of improper considerations. Although a judge is never constrained to accept a plea, Judge Cunningham accepted Rhodes's plea to Voluntary Manslaughter and, correctly, directed compilation of a presentence report. Having received the report, he then declined to use it and relied instead on police reports he ordered from the Commonwealth, *ex parte.* His use of those reports remained undisclosed to Rhodes's counsel until the sentencing hearing was in progress and the court had already completed and distributed its Statement of Sentencing Rationale to all present in the courtroom, except counsel. Accordingly, Rhodes was deprived of any meaningful opportunity to challenge the layered hearsay of the reports, which examination of the Statement of Sentencing Rationale verifies served as the primary source of information on which the court made its determination to impose a sentence close to the statutory maximum. In that Statement, as well as its remarks at sentencing, the court stated, repeatedly and unequivocally, that it reached its determination based on Rhodes's commission of a premeditated killing, notwithstanding the fact that premeditation is not an element of the crime to which Rhodes offered her plea. Consistent with its determination concerning premeditation, the court's Statement then repudiated the Commonwealth's sentencing recommendation on the basis of an unrelated case (Chytoria Graham) before it offered the District Attorney any opportunity to respond or explain. To all appearances, the court then made *de facto* findings of fact, seemingly ascribing conduct to Rhodes, e.g., inducing her own labor, that appears nowhere in the charges against her.

¶ 27 Viewed from a third party perspective, these occurrences render an appearance that the court adjudged this case based not on the conduct charged, but on conduct intimated—which, because it involved a child victim, according to Judge Cunningham, must merit an aggravated sentence regardless of the plea the defendant tendered or the factual basis for that plea. *See Lemanski,* 529 A.2d at 1088 (indicating that the appearance of partiality may be shown by evidence that the court harbored a bias concerning a particular class of cases). This approach is documented throughout the record, most particularly in the court's repudiation of D.A. Foulk's explanation of the exercise of the Commonwealth's prosecutorial discretion and in the court's declaration that any other approach "creates an open season on all infant children in our community." *See* n. 14, *supra* (quoting Statement of Sentence Rationale, 11/21/08, at 30). These occurrences, coupled with the court's responsiveness to the apparent suggestion of the Erie Times News that Rhodes's conduct was not consistent with a charge of Voluntary Manslaughter and that other defendants who killed children had received long term sentences, *see supra,* n. 15, are sufficient to cause us significant reservation at the extent to which the

court imposed sentence without prejudging the case, giving voice to the judge's personal sentencing philosophy, or complying with the demands of external opinion.

¶ 28 The court's explanation does little to allay our concern. In point of fact, its attacks on defense counsel's integrity and its cursory denial of Rhodes's motion for bail on the basis of an obvious typographical error lend additional substance to our reservations. Although we approach this determination with regret, we must assure that no hint of improper motive undermines the just resolution of criminal charges in our courts and that no defendant's sentence be subject to a reasoned perception of bias. *See Darush*, 459 A.2d at 732. *See also Benchoff*, 700 A.2d at 1294–1295. "We, as jurists, are committed to impartiality. But if we allow our personal opinions and goals to cause us to manipulate the law, our commitment is no longer credible, no matter how righteous our purpose." *Lemanski*, 529 A.2d at 1089. Under the circumstances of this case, given the cumulative effect of Judge Cunningham's conduct and remarks, *see Benchoff*, 700 A.2d at 1295, it is clear that the trial court's impartiality could be reasonably questioned. We conclude accordingly that Judge Cunningham abused his discretion in refusing to recuse himself in response to the multiple motions filed by Rhodes's counsel. In view of the taint that follows such a determination, we vacate the judgment of sentence and remand this case for re-sentencing before another judge. *See Whitmore*, 912 A.2d at 834.

¶ 29 Judgment of sentence VACATED. Case REMANDED for resentencing before another judge. Jurisdiction RELINQUISHED.